**In re Marcel MOLINA Y. VEDIA, Irma Molina Y Vedia, Debtors.**

**Bankruptcy No. 91–01455–H5–11.**

United States Bankruptcy Court, S.D. Texas, Houston Division.

July 15, 1992.

Richard S. London, Houston, TX, for debtors.

Annie O. Fabio, Houston, TX, for Figgie Acceptance Corp.

Jean White, F.D.I.C. Legal Dept., Houston, TX, for F.D.I.C.

David Waddell, Houston, TX, for Wells Fargo Credit Corp.

John Banks, Houston, TX, for Houston Independent Bank.

## ORDER AND MEMORANDUM OPINION ON SCOPE OF EARNINGS EXCEPTION

KAREN KENNEDY BROWN, Bankruptcy Judge.

Figgie Acceptance Corporation joined by the Federal Deposit Ins. Corp., Houston Independent Bank, N.A., and Wells Fargo Credit Corp. moved to determine what constitutes property of the estate with respect to an individual Chapter 11 debtor-in-possession in light of the earnings exception embodied in 11 U.S.C. § 541(a)(6). Along with other matters, the Court held a hearing on the motion on June 23, 1992. A proceeding to determine what constitutes property of the estate under Section 541 is a core proceeding under 28 U.S.C. § 157(b)(2)(A), (B), and (E) with jurisdiction arising under 28 U.S.C. § 1334, § 157(a), and this district's general order of reference. The following order and memorandum opinion constitutes this Court's findings of facts and conclusions of law pursuant to FRBP 7052 made applicable to contested matters under FRBP 9014.

### I. Factual Background

Dr. Marcel Molina Y Vedia and his spouse filed a voluntary petition for reorganization under Chapter 11 on February 25, 1991. Debtors have at all times since the petition operated their affairs as debtors-in-possession pursuant to 11 U.S.C. § 1108. Dr. Molina is a surgeon and maintains a specialized practice in the Spring Branch area of Houston, Texas. Dr. Molina's spouse, Irma, is not employed, nor does she generate any income on her own behalf.

Dr. Molina's educational background and his achievements are noteworthy. Dr. Molina was born on July 31, 1929 in Paris, France, and was raised in Buenos Aires, Argentina. After graduating valedictorian of his high school class, he was awarded a four-year scholarship to Duke University, where he enrolled in September of 1950. In July of 1953, Dr. Molina entered Temple University School of Medicine, where he obtained his medical degree in July of 1957. After completing internship, he went on to specialize in thoracic and cardiovascular surgical training at the University of Virginia. Upon completing his surgical residency in June of 1962, Dr. Molina obtained a medical license to practice in Pennsylvania and Virginia.

In July of 1962, Dr. Molina entered the United States Army Medical Corps. While in the service, he completed parachute training school and obtained a certificate of "jungle expert" from the United States Army Jungle Warfare School. After resigning his commission in the Army, Dr. Molina entered private practice as a general surgeon in Houston, Texas.

From 1965 to 1975, Dr. Molina built his practice in Houston, concentrating exclusively at Spring Branch Medical Center. As a result of his skill and success as a surgeon, Dr. Molina's income grew, requiring management decisions aimed at establishing profitable investments and reducing income tax liability. During the period between 1975 and 1985, however, these investments soured because they were initially ill-conceived or because of the downturn in Houston's economy. The cash flow necessary to keep these investments afloat restricted debtor's ability to pay his personal income taxes. In an attempt to satisfy this growing tax debt, debtors mortgaged previously unencumbered properties and obtained second liens on already mortgaged properties. When the Internal Revenue Service disallowed a substantial deduction for investment losses, Dr. Molina and his wife filed a voluntary petition under Chapter 11.

## II. Dr. Molina's Medical Practice as of the Petition Date

Dr. Molina's current practice consists primarily of a specialized surgical technique Dr. Molina pioneered, commonly referred to as gastric segmentation, a procedure for the control and management of morbid obesity. Dr. Molina owns the building where his offices are located on 1454 Campbell Road, Houston, Texas. Dr. Molina employs two registered nurses, an office manager, a receptionist, an insurance clerk, a filing clerk, and janitorial personnel. The two registered nurses answer inquiries from clients and prospective clients, but do not assist Dr. Molina in surgery, nor do they engage in any other traditional nursing management of patients.

Dr. Molina's practice is both local and national in scope, with those seeking his services referred to him by other patients or physicians. He does not advertise or market his services in any other fashion. A prospective patient contacts Dr. Molina's office and thereupon is sent a packet of information regarding the surgery and certain prerequisites which must be satisfied before the surgery will be performed. Once the packet is returned and the patient is evaluated for the patient's suitability for the procedure, information is submitted to the prospective client's insurance carrier for a determination of whether coverage exists for the proposed operation. Approximately ninety percent of those patients who undergo this operation are able to be reimbursed from their insurance companies.

After Dr. Molina and a prospective patient exchange the primary information and the prospective patient still expresses interest in the operation, he or she must attend an all-day seminar conducted every Tuesday at Dr. Molina's offices. Approximately fifty to sixty prospective patients attend each seminar. Of this number, approximately forty percent will elect to proceed with the operation.

The surgeries are performed exclusively at Spring Branch Medical Center. Dr. Molina is not charged for the use of its facilities, nor is he charged for the hospital staff who assist him in surgery. The hospital receives its compensation from the patient who is charged for all the normal costs a hospital would charge for any surgical procedure, precare, and aftercare. Dr. Molina charges $3,500 to perform a gastric segmentation procedure and $300 for the preparation of records necessary to admit a patient to the hospital.

It is undisputed that Dr. Molina is capable of conducting his surgical practice with staff and offices located exclusively at Spring Branch Medical Center and has done so previously for approximately one year. When Dr. Molina has conducted his practice at the hospital, the functions performed by the staff at his building were performed by hospital staff at no charge to Dr. Molina. Because of preference, habit, or aesthetics, Dr. Molina chooses to office

elsewhere than the hospital. If Dr. Molina were forced to conduct his practice from Spring Branch Medical Center, although he would suffer a temporary decline in revenues from the dislocation of his office, the creditors do not dispute that his earnings would eventually increase because of the reduction in overhead costs.

### III. Debtors' Assets, Postpetition Earnings, and Proposed Disposition.

Dr. Molina and his wife listed real and personal property with a value at the time of filing of approximately $4 million. Debtors' liabilities were listed in excess of $6 million. Dr. Molina generates on a postpetition basis approximately $150,000 per month in revenues attributed to the surgeries he performs. The building where Dr. Molina has his offices has a value of $325,000 with a lien against the real property and improvements of approximately $515,000, leaving no equity in the property. The office equipment, furnishings, and supplies at 1454 Campbell have a value of approximately $120,000 and are apparently unencumbered. Debtors' total unencumbered nonexempt assets totals approximately $480,000. In the event debtors' nonexempt assets are liquidated under Chapter 7, the proceeds would be paid exclusively to priority claimants, most notably the IRS in satisfaction of its priority debt of approximately $1,576,000.00. Liquidation, therefore, under Chapter 7 would leave no residual for payment of any of the general unsecured claims.

Debtors' proposed plan, funded primarily from income derived from Dr. Molina's practice, provides for payment of approximately forty per cent of the total amount of the unsecured claims. A competing plan proposed by Houston Independent Bank would include virtually all of debtors' postpetition earnings attributed to the surgeries he performs towards satisfaction of all unsecured claims. Consequently, confirmation of either proposed plan turns on this Court's interpretation of the earnings exception embodied in 11 U.S.C. § 541(a)(6).

### IV. Case Law Interpreting the Earnings Exception of 11 U.S.C. § 541(a)(6)

11 U.S.C. § 541(a)(1), (6), and (7) states:

(a) The commencement of a case under section 301, 302, or 303 of this title creates an estate. Such estate is comprised of all the following property, wherever located and by whomever held:

(1) Except as provided in subsections (b) and (c)(2) of this section, all legal or equitable interests of the debtor in property as of the commencement of the case ...

(6) Proceeds, product, offspring, rents, and or profits of or from property of the estate, except such as are earnings from services performed by an individual debtor after the commencement of the case.

(7) Any interest in property that the estate acquires after the commencement of the case.

Although several cases address at least peripherally the scope of the earnings exception of Section 541(a)(6), three cases are central to consideration: *In re FitzSimmons*, 725 F.2d 1208 (9th Cir.1984); *In re Cooley*, 87 B.R. 432 (Bankr.S.D.Tex.1988); and *In re Herberman*, 122 B.R. 273 (Bankr.W.D.Tex.1990).

In *FitzSimmons*, the Ninth Circuit held that the earnings exception excluded from property of the estate all earnings generated by services "personally" performed by an individual debtor. *In re FitzSimmons*, 725 F.2d at 1211. The Ninth Circuit concluded that to the extent that the earnings of an attorney's law practice were not attributable to his personal services but to the invested capital, accounts receivable, good will, employment contracts with the firm's staff, client relationships or fee agreements, such earnings of the law practice accrued to the estate. *Id.* The Court reasoned that creditors should be entitled to enjoy the profits earned by a sole proprietorship just as they must suffer its losses. The Ninth Circuit, consequently, remanded to the bankruptcy court for a determination of the portion of the debtor's postpetition

earnings attributable to his personal efforts. *Id.*

As in the case at bar, the bankruptcy court in *Cooley* was confronted with a debtor/physician who filed a voluntary Chapter 11 petition as a sole proprietor and who also sought to exclude all postpetition earnings derived from the sole proprietorship. *In re Cooley*, 87 B.R. at 435. The debtor in *Cooley* also earned substantial revenues from his practice, with such revenues earned not only by Dr. Cooley himself but by five associate surgeons, highly-trained to perform the most delicate heart surgeries. Questioning the Ninth Circuit's effort to engraft the term "personally" into Section 541(a)(6), the bankruptcy court in *Cooley* placed the ultimate burden of proof upon the creditors to show that an individual debtor's earnings were proceeds, product, rents, or profits derived from assets or other property interests which had previously accrued to the estate pursuant to a Section of 541 other than 541(a)(6). *Id.* at 441.

In considering the impact of Sections 541(a)(1) and 541(a)(6) on the case before it, the court in *Cooley* relied upon several statutory indicia. First, rejecting the *Fitz-Simmons* distinction, it noted that Congress, while well aware of the distinction between an individual and a business organized as a sole proprietorship, chose not to create separate debtor entities for an individual and his sole proprietorship. *Id.* at 439. Second, the court found that Section 541 must be interpreted in light of Congress' intent that it apply to all chapters under Title 11, to all debtors whether corporations, partnerships, or individuals, and to both voluntary and involuntary bankruptcies. 11 U.S.C. §§ 103, 101(41), 303, 541. More importantly, the court focused on Congress' concern in drafting Section 541(a)(6) as well as its drafting of other provisions of the Bankruptcy Code that its provisions would not violate the Thirteenth Amendment's prohibition against involuntary servitude. *Id.* at 440. Finally, the bankruptcy court in *Cooley* relied on Congress' protection of an individual's right to a fresh start. *Id.*

Lastly, by contrast, in *Herberman*, the bankruptcy court interpreted Section 541(a)(6) so that all earnings of any service-oriented enterprise fell outside the earnings exception clause, except to the extent allowable to the individual debtor as "salary" under 11 U.S.C. § 503(b) as an administrative expense. *In re Herberman*, 122 B.R. at 283. To arrive at its conclusion that a doctor's billings fell outside the earnings exception clause, the court reasoned that such billings, while earnings by debtor, were not earnings from "proceeds, product, offspring, rents, and or profits." *Id.* at 278; 11 U.S.C. § 541(a)(6).

Thus under the *Herberman* analysis, the earnings exception "backs out" of the estate "such [proceeds, product, offspring, rents, and profits] as are earnings from services performed by an individual debtor after the commencement of the case." *In re Herberman* at 278. The only earnings subject to the "backout exception" were those earnings approved by the Court as salary under Section 503. *Id.* at 283. Instead of determining whether such postpetition earnings were property of the estate or property of the debtor under Section 541(a)(6), the court in *Herberman* held that such earnings, *indeed all earnings of any debtor-in-possession business*, were property of the estate under Section 541(a)(7) as an "interest in property the estate acquires after the commencement of the case." *Id.* See also 11 U.S.C. § 541(a)(7). The court in *Herberman* further supported its limitation of the language in Section 541(a)(6) by focusing on the fiduciary duty a debtor-in-possession owes to the estate in a Chapter 11 case, and its conclusion that there was no "true" conflict with the Thirteenth Amendment. *Id.* at 281–86.

## V. *Herberman* Analysis

■ This Court respectfully disagrees with the reasoning and the conclusion reached by the court in *Herberman*. *Herberman* narrows the earnings exception clause to the point of extinction. No other court has interpreted Section 541(a)(6) so narrowly as to essentially exclude that provision from consideration in determining whether earnings of an individual Chapter

11 debtor are property of the estate. *See In re FitzSimmons, supra; In re Altchek,* 124 B.R. 944 (Bankr.S.D.N.Y.1991); *In re Cooley, supra; In re Neuman,* 75 B.R. 966 (Bankr.S.D.N.Y.1987); *In re Armstrong,* 73 B.R. 143 (Bankr.N.D.Tex.1987); *In re Carrere,* 64 B.R. 156 (Bankr.C.D.Cal.1986); *In re Bernheim,* 62 B.R. 739 (Bankr.D.N.J. 1986); *In re Pecht,* 57 B.R. 137 (Bankr. E.D.Va.1986); *In re Bofill,* 25 B.R. 550 (Bankr.S.D.N.Y.1982).

Pivotal to the Court's determination in *Herberman* that a doctor's billings fell outside Section 541(a)(6) was the premise that such billings were not "proceeds, product, offspring, rents, and or profits of or from property of the estate." *See* 11 U.S.C. § 541(a)(6); *In re Herberman,* 122 B.R. at 278. Consequently, under *Herberman,* although a doctor's postpetition billings may be "earnings from services performed by an individual debtor after the commencement of the case," they fail to qualify for the earnings exception because they are not earnings from "proceeds, product, ... of or from property of the estate." 11 U.S.C. § 541(a)(6).

To the contrary, Congress included the earnings exception clause within the main clause of Section 541(a)(6) requiring inclusion as property of the estate for proceeds, product, etc., because such earnings are inherently derived from one of the enumerated categories in the main clause. There can be no other reason for the juxtaposition of these two clauses in the same sentence (one for inclusion, the other for exclusion) apart from Congress' conclusion that but-for the exclusion language an individual's service earnings would be "proceeds, product, offspring, rents and or profits of or from property of the estate."

The court in *Herberman* correctly noted that "[t]here can be no 'part' of a debtor that is not in bankruptcy during the pendency of the Chapter 11 proceeding." *In re Herberman,* 122 B.R. at 279. However, this Court disagrees with the statement that "postpetition earnings of the enterprise logically fall neatly into Section 541(a)(7) as 'interest[s] in property acquired by the estate during the pendency of the

bankruptcy.'" *Id.* The sweep by *Herberman* of all earnings of every Chapter 11 enterprise into the estate under Section 541(a)(7) ignores Section 541(a)(6) to such an extent that Section 541(a)(6) becomes wholly superfluous. This construction disregards the clear language of Section 541(a)(6), which includes as estate property the enumerated accruals, proceeds, product, etc. These accruals to the estate are derived principally but not exclusively from Section 541(a)(1), which looks to the property interests the debtor holds as of the commencement of the case.

Sections 541(a)(6) and 541(a)(7) address overlapping but not identical categories of estate property. Postpetition earnings from any business enterprise, whether corporation, partnership, or sole proprietorship, will employ the assets of the estate and will necessarily generate proceeds, product, offspring, rents, and/or profits. Thus, the sale of goods which the debtor had on hand as of the commencement of the case produce "proceeds" or "profits" subject to inclusion under Section 541(a)(6), not Section 541(a)(7). Similarly, a service-oriented enterprise produces profits included in estate property under Section 541(a)(6), rather than after acquired property of the estate under Section 541(a)(7). Thus, contracts for services of other *non-debtor* individuals employed by the debtor, such as the associate surgeons in *Cooley,* will be property of the estate under 541(a)(6). *See In re Cooley,* 87 B.R. at 443–44. With respect to the profits of a service-oriented enterprise, that portion of the profits represented by the earnings from services performed by an individual debtor after the commencement of the case is not property of the estate.

Moreover, the Bankruptcy Code reflects various policy considerations towards an individual debtor that preclude the construction of Section 541(a)(6) in *Herberman.* In determining what constitutes property of the estate, Section 541 applies to all chapters irrespective of whether an individual files a voluntary petition or is subject to an involuntary petition by his creditors. 11 U.S.C. §§ 103(a) and 303. Thus, Section 541 must be read to balance

appropriate legislative concerns regarding what property interests are to be included as property of the estate in light of constitutional concerns, namely, the Thirteenth Amendment's prohibition against involuntary servitude.

The Thirteenth Amendment was a clear concern to Congress in drafting Section 1306 and Section 1207 of the Bankruptcy Code. Both provisions augment Section 541's definition of property of the estate to include "earnings from services performed by the debtor after the commencement of the case." *See* 11 U.S.C. § 1306(a)(2) and 11 U.S.C. § 1207(a)(2). The inclusion language of Sections 1306 and 1207 is virtually identical to the exclusion language of Section 541(a)(6). Congress manifested a clear intent that Chapter 13 and Chapter 12 would be strictly voluntary, and no creditor can initiate an involuntary proceeding against a debtor eligible under those chapters. *See* 11 U.S.C. § 303(a). Similar Congressional concern for the Thirteenth Amendment is evidenced by the fact that debtors under Chapter 12 and Chapter 13 have an absolute right to convert or dismiss their cases. *See* 11 U.S.C. § 1307 and 11 U.S.C. § 1208.

The question is not, as stated in *Herberman*, whether the Thirteenth Amendment is implicated, but whether Congress in drafting Section 541 sought to avoid any potential conflict with the Thirteenth Amendment. Congress expressed its concern with the Thirteenth Amendment in the following passage:

> As under current law, Chapter 13 is completely voluntary. This committee firmly rejected the idea of mandatory or involuntary Chapter XIII in the 90th Congress. The Thirteenth Amendment prohibits involuntary servitude. *Though it has never been tested in the wage earner plan context,* it has been suggested that a mandatory Chapter 13 by forcing an individual to work for creditors would violate this prohibition. (emphasis added).

H.R.Rep. No. 95–595, 95th Cong. 1st Sess. 322 (1977), at 120; S.Rep. No. 95–989, 95th Cong.2d Sess. 94 (1978), at 32, U.S.Code of Cong. & Amin. News 1978, at 6080.

■ Similarly, the earnings exception embodied in 11 U.S.C. § 541(a)(6) expresses Congress' intent to avoid any *potential* conflict with the Thirteenth Amendment, whether an actual conflict in a particular case exists. An individual debtor can be subjected to an involuntary petition under either Chapter 7 or Chapter 11. 11 U.S.C. § 303(a). Furthermore, under Chapter 11, a debtor may not as a matter of right convert a case to Chapter 7 if the case originally was commenced as an involuntary case under Chapter 11. *See* 11 U.S.C. § 1112(a)(2). Congress relied upon the earnings exception to avoid any potential conflict with the Thirteenth Amendment since an individual is eligible under Chapter 11 and potentially subject to an involuntary petition. The use of identical language in the exclusion language of Section 541(a)(6) contrasted with the inclusion language of Sections 1306 and 1207, given Congress' articulated concerns about the Thirteenth Amendment, strongly militates against the *Herberman* reasoning.

The Court finds strong support for this interpretation in *Toibb v. Radloff*, — U.S. —, 111 S.Ct. 2197, 115 L.Ed.2d 145 (1991). In *Toibb* the Supreme Court held that an individual debtor with no ongoing business could file for reorganization under Chapter 11. The court in responding to an argument that individual non-business debtors should not be eligible for Chapter 11 relief because they might be subject to an involuntary proceeding pointed out a crucial distinction regarding earnings under Chapter 11 and Chapter 13:

> ... the argument overlooks Congress' primary concern about a debtor's being forced into bankruptcy under Chapter 13: that such a debtor, whose future wages are not exempt from the bankruptcy estate, § 1322(a)(1), would be compelled to toil for the benefit of creditors in violation of the Thirteenth Amendment's involuntary servitude prohibition. (citation omitted). *Because there is no comparable provision in Chapter 11 requiring a debtor to pay future wages to a creditor, Congress' concern about imposing*

*involuntary servitude on a Chapter 13 debtor is not relevant to a Chapter 11 reorganization.* (emphasis added). *Toibb v. Radloff,* —— U.S. at ——, 111 S.Ct. at 2202. Clearly, the Supreme Court recognized the implications of the Thirteenth Amendment, and Congress' attempt to avoid any potential conflict through its enactment of the earnings exception embodied in Section 541(a)(6). Although the Supreme Court referred to "wages" rather than "earnings," wages are simply a subset of earnings. Both 11 U.S.C. § 1306(a)(2) and 11 U.S.C. § 541(a)(6) refer to "earnings" from services performed after the commencement of the case.

■ The *Herberman* court's reliance on the debtor-in-possession's fiduciary obligations to the Chapter 11 estate to support its contention that such earnings are property of the estate begs the question. Property of the estate is not determined by the debtor-in-possession's fiduciary obligations to the estate; rather, the scope of the debtor-in-possession's fiduciary obligation is determined by the property constituting the estate. Irrefutably, the debtor-in-possession owes no obligation to the estate for non-estate property. The individual Chapter 11 debtor owes no fiduciary obligation to the creditors for property once exempted under 11 U.S.C. § 522. Similarly, property excluded from the estate under Section 541(c)(2), ERISA benefits, for example, does not become property of the estate because debtor also has a fiduciary role as debtor-in-possession under Chapter 11. *See Patterson v. Shumate,* —— U.S. ——, 112 S.Ct. 2242, 119 L.Ed.2d 519 (1992). Defining postpetition services earnings as property of the estate because the debtor is also a debtor-in-possession with fiduciary obligations to the estate affords no sound basis for resolving the scope of the earnings exception.

The Court finds considerable support for the narrow role the debtor's fiduciary obligations have in defining what constitutes property of the estate (as well as support for the proper construction of the earnings exception) in the treatment of personal service contracts under 11 U.S.C. § 365 and

case law interpreting that provision. *See In re Taylor,* 913 F.2d 102 (3rd Cir.1990); *In re Tomer,* 128 B.R. 746 (Bankr.S.D.Ill. 1991); *In re Carrere,* 64 B.R. 156 (Bankr. C.D.Cal.1986); *In re Bofill,* 25 B.R. 550 (Bankr.S.D.N.Y.1982); *In re Noonan,* 17 B.R. 793 (Bankr.S.D.N.Y.1982).

*In re Taylor* is particularly illustrative. There the debtor filed a voluntary Chapter 11 bankruptcy proceeding and sought court approval to reject certain executory personal service contracts, including a music publishing agreement. The debtor-in-possession despite his role of fiduciary of the estate was not barred from rejecting his executory contract for personal services. *In re Taylor,* 913 F.2d at 106. The court noted that a personal services contract could not be assumed under Section 365(c)(1)(A) absent the *consent* of both the debtor and the non-debtor party to the contract. *Id.* Consequently, unless the debtor in *Taylor* consented to the assumption of the personal service contract, the creditor to the contract could not compel such assumption based on the debtor's fiduciary role. The court emphasized that consent on the part of the Chapter 11 debtor was necessary for assumption because of "widespread distaste for involuntary servitude." *Id.* at 107.

This same concern precluding compulsory assumption of prepetition personal service contracts, to be consistent, must apply to postpetition personal service contracts, such as those between doctors and patients. If a prepetition personal services contract is not an asset available for the benefit of creditors in a Chapter 11 Plan absent the debtor's consent, *In re Noonan,* 17 B.R. at 798; *In re Taylor,* 913 F.2d at 107, neither should a postpetition personal service contract be available for creditors. Just as Section 365(c) precludes a creditor from compelling a Chapter 11 debtor to assume an existing personal services contract for the benefit of the estate, Section 541(a)(6) also precludes a creditor from asserting that earnings from a Chapter 11 debtor's postpetition services are property of the estate. Thus, Congress designed Section 365(c)(1) and Section 541(a)(6) to work in tandem to avoid any potential for

conflict with the Thirteenth Amendment. *See In re Bofill,* 25 B.R. 550 (Bankr. S.D.N.Y.1982).

Section 541(a)(7) must be read in its appropriate context—following Section 541(a)(1), in order to determine estate versus debtor's property. This snapshot assessment is made as of the date of the bankruptcy filing. *In re Cooley, supra* at 436. This distinction is not eliminated just because the debtor is a sole proprietor. As noted by the court in *In re Eugene Doemling,* 127 B.R. 954, 956 (Bankr.E.D.Pa.1991):

> Section 541(a)(1) specifically limits the property of the estate to the debtor's property interest as they exist when the case is commenced. Section 541(a)(7) does not in any way undermine the goal of establishing a critical time at which to determine which of debtor's property becomes part of the estate. Instead, it focuses on property interests acquired by the estate after the commencement of the case. Obviously, after the commencement of the case, the estate has an existence that is completely separate from that of the debtor. Section 541(a)(7) covers only property that the estate itself acquires after the commencement of the proceeding.

*In re Doemling* 127 B.R. at 956.

In *Doemling* the court considered whether claims arising from postpetition personal injuries to a Chapter 11 debtor were property of the estate under Section 541(a)(1). The court relied on the Supreme Court holding in *Segal v. Rochelle,* 382 U.S. 375, 86 S.Ct. 511, 15 L.Ed.2d 428 (1966) to conclude that the tort claims were rooted not in prepetition but postpetition events and intertwined with the debtor's fundamental ability to make a fresh start. Consequently, the tort claim was not after-acquired property of the estate under Section 541(a)(7). *Id.* at 957.

Nevertheless, the creditors in the case at bar rely on the Committee notes to Section 503 to support their construction of Section 541(a)(6). The Committee notes state:

> Postpetition payments to an individual debtor for services rendered to the estate are administrative expenses and are not

property of the estate when received by the debtor. This situation would most likely arise when the individual was a sole proprietor and was employed by the estate to run the business after the commencement of the case. An individual debtor in possession would be so employed for example. *See Local Loan v. Hunt,* 292 U.S. 234, 243 [54 S.Ct. 695, 698–99, 78 L.Ed. 1230] (1943).

S.Rep. No. 95–989, *supra* at 66. *Herberman* and the creditors in the case at bar extrapolate this legislative history to conclude that Congress intended an individual debtor-in-possession be entitled only to a salary under Section 503. Conversely, Debtor argues to read Section 503(b) and the committee notes so as to preclude a Chapter 11 debtor from excluding under Section 541(a)(6) earnings derived from his personal postpetition services would narrow the earnings exception to the point of irrelevancy.

Administrative expenses, if actual and necessary to preserve the estate, are paid from the estate. 11 U.S.C. § 503(b). Section 541 statutorily defines the estate and the pool from which administrative expenses are paid, *not* Section 503. Congress has made clear in Section 541(a)(6) that earnings from services performed by an individual debtor after the commencement of the case are not property of the estate. While there may be situations where debtor-in-possession may be paid *from the estate* for services to the estate in preserving estate assets, it does not follow that all the debtor-in-possession's personal services earnings are, therefore, property of the estate.

Moreover, the Supreme Court case referenced in the Committee notes, *Local Loan v. Hunt, supra,* contradicts the *Herberman* construction of Sections 503 and 541(a)(6). In *Hunt,* a creditor attempted to enforce a prepetition assignment of future wages against the earnings of a discharged debtor. The Court concluded that despite the existence of a lien specifically unextinguished under Illinois law by the discharge, "clear and unmistakable" policies precluded its enforcement:

When a person assigns future wages, he, in effect, pledges his future earning power. The power of the individual to earn a living for himself and those dependent upon him is in the nature of a personal liberty quite as much if not more than it is a property right. To preserve its free exercise is of the utmost importance, not only because it is a fundamental private necessity, but because it is a matter of great public concern ... The amount of the indebtedness, or the proportion of wages assigned, may here be small, but the principle, once established, will equally apply where both are very great. The new opportunity in life and the clear field for future effort, which it is the purpose of the Bankruptcy Act to afford the emancipated debtor, would be of little value to the wage-earner if he were obliged to face the necessity of devoting the whole or a considerable portion of his earnings for an indefinite time in the future to the payment of indebtedness incurred prior to his bankruptcy.

*Id.* at 245, 54 S.Ct. at 699. Given the Court's holding in *Hunt* and its firm protection of an individual's postpetition service earnings on policy grounds as well as settled bankruptcy law, it is difficult to view the Committee's notes as indicative of support for abandoning the earnings exception in favor of a court-imposed salary under Section 503.

### VI. Application of the Earnings Exception to the Molinas

■ This Court rejects the *Herberman* construction and follows the established precedent of *In re Cooley* and *In re Fitz-Simmons.* Since the creditors rely exclusively on *Herberman* rather than attempting to distinguish in a substantive manner the *FitzSimmons* and *Cooley* opinions, the Court need not analyze further the two opinions. In the case before the Court, adherence to either produces the same result.

The creditors offer no evidence that Dr. Molina's earnings from surgeries performed postpetition constitute anything but earnings excepted under Section 541(a)(6). Unlike *Cooley* and *FitzSimmons,* Dr. Molina employs no other professionals who generate earnings for the sole proprietorship. Dr. Molina's support staff does not generate earnings, but performs a non-income producing, auxiliary function exclusively. Any good will of the sole proprietorship is exclusively the personal good will of Dr. Molina. The sole proprietorship generates postpetition profits, but those profits are solely earnings from personal services of an individual debtor after the commencement of the case. Debtors concede that all accounts receivable generated from Dr. Molina's prepetition services are property of the estate.

Although it may be argued that the building and medical equipment therein, clearly property of the estate under Section 541(a)(1), are of value in generating postpetition earnings, the creditors offer no basis for quantifying that value. The creditors offer no evidence, other than asset values, from which this Court could conclude that these assets contribute in any way to the postpetition earnings of the sole proprietorship. With respect to the building, since its debt exceeds its value and since the building is not essential or even necessary to Dr. Molina's surgical practice, creditors fail to prove that the building produces some identifiable part of the postpetition income stream. Moreover, the secured creditor on the building receives adequate protection payments from postpetition service earnings, so further compensation to unsecured creditors is unwarranted in the absence of any equity in the property. Similarly, the office and medical equipment is not essential or even necessary to the production of income. No patient examinations actually occur in the office. Testimony established that Dr. Molina could conduct his office practice at Spring Branch Medical Center and ultimately profit with higher net earnings.

Creditors are entitled to realize the value of these office furnishings, as they are entitled to realize the value of all property of the estate. The question is whether that value will be realized through liquidation under either Chapter 7 or Chapter 11 or be realized through reorganization under a

Chapter 11 Plan. Debtors argue that the assets would be worth more reorganized, under a Chapter 11 Plan given the large IRS claim, and debtors' proposed contribution of a portion of Dr. Molina's future earnings toward funding of the Plan. That issue, however, is not immediately before the Court.

The Court concludes that all earnings from the sole proprietorship are not property of the estate by virtue of 11 U.S.C. § 541(a)(6). Debtors' motion for approval of their disclosure statement will be approved by separate order of the Court. The motion of Houston Independent Bank for approval of its disclosure statement as modified since it relies upon the postpetition earnings of Dr. Molina is hereby DENIED.