**In re Robert J.G. KEENAN and Holly R.J. Keenan, Debtors.**

**Bankruptcy No. 95–13708 K.**

United States Bankruptcy Court, W.D. New York.

April 23, 1996.

Daniel F. Brown, Damon & Morey, Buffalo, New York, for Debtors.

Jeffrey Freedman, William M. Billik, Buffalo, New York, for Personal Injury Claim.

Warren B. Rosenbaum, Shapiro, Rosenbaum & Liebschutz, LLP, Rochester, New York, for Norwest Financial New York, Inc.

MICHAEL J. KAPLAN, Chief Judge.

In this Chapter 11 case, the Debtors-in-Possession are about to receive about $100,-000 from an insurance claim arising out of injuries that Dr. Keenan sustained from two different pre-petition car accidents. In re-

sponse to their notice to creditors that they intended to settle that claim, one unsecured creditor has asked this Court to limit the Debtors' use of the proceeds. The creditor fears that the proceeds will be dissipated for the Debtors' personal needs and benefit, even though some of the proceeds of that pre-petition cause of action should be viewed as "property of the estate" under 11 U.S.C. § 541(a)(1) or (7).

Specifically, the creditor asks the Court to decide how much of the recovery the Debtors should be allowed to devote to their own personal expenses, how much to their "business" (Dr. Keenan's medical practice), and how much, if any, should be set aside toward an eventual reorganization plan. Since the most significant asset of this case is the stream of income generated by Dr. Keenan, the prospects of recovery for creditors depend on: (1) how much income (including these insurance proceeds) is applied to enhancing that stream of income by supporting and building the medical practice, as opposed to dissipation to meet personal needs; and (2) how much is eventually committed by the Debtors for actual distribution to creditors. Moreover, the possibility of conversion or dismissal between now and the time of confirmation of a plan must be considered; and if that were to occur, creditors would conceivably benefit from the current application of income to non-exempt physical assets such as office equipment, but would be out of luck to the extent that current income, including these insurance proceeds, was expended for personal needs. Of the first $25,000 of the proceeds, the Debtors and the creditors seemed to have agreed that $15,000 may be spent on office expenses and $10,000 on personal needs, and the Court approved that. The creditor asks the Court to decide how the remainder should be allocated and to limit its use accordingly.

The Court concludes that it ought not to make the computations and impose the limitations the creditor seeks. Rather, the Debtors, creditor, Creditor's Committee, and U.S.

Trustee should negotiate a resolution to this matter. If the Debtors fail to reach such accord, then they act at peril of having to defend a motion to convert the case or defend a motion for some other recognized form of relief.

For the Court to accede to this creditor's request would be to administer the estate, perhaps to the prejudice of other creditors, as explained below. This is not to say that the Court does not want such questions to be continued to be asked—it does. But it is sometimes more beneficial for the question to be asked, and then the parties left to themselves to resolve their differences, or (in the absence of resolution) to raise the stakes.

## BACKGROUND

How the Court should treat the post-petition income of Chapter 11 Debtors who are natural persons is an issue that has been addressed by several other courts, without consensus.

In a Chapter 13 case, 11 U.S.C. § 1306(a)(2) makes it clear that a debtor's post-petition personal service income is "property of the estate," which is to say property impressed with a trust in favor of creditors. But in a Chapter 11 case, property of the estate includes "[p]roceeds, product, offspring, rents, or profits of or from property of the estate, *except such as are earnings from services performed by an individual debtor after the commencement of the case.*" 11 U.S.C. § 541(a)(6) (emphasis added).

This Court has written before on the subject of a Chapter 11 debtor who earns no personal service income, but who instead must spend property of the estate generated by his income-producing properties for his own personal and family needs.[1] In the earlier decisions it was ruled that the personal living expenses of such a debtor are "ordinary course" expenses for his Chapter 11 estate, and property of the estate may be used therefor.

---

1. *See In re Bradley,* No. 91–13893 K, slip. op. (Bankr.W.D.N.Y. Nov. 24, 1992) (now printed as Appendix to *In re Bradley,* 185 B.R. 7, 10–12 (Bankr.W.D.N.Y.1995)). That cases involving individuals are entirely different from cases involving corporations and issues of corporate salaries to owners requires no elucidation; the Court regularly fixes the salaries of corporate principals in light of 11 U.S.C. § 1129(a)(4), which requires "reasonableness."

Now before this Court is a Chapter 11 debtor, a physician, whose principal income is personal service income. (His co-debtor spouse is not employed, according to the schedules filed in this case.) For purposes of this decision, the precise issue raised is how this Court should react to an unsecured creditor's objection to the Debtors' proposed acceptance and use of approximately $100,000 from pre-petition personal injury claims. The Debtors want to use it for personal living expenses, as well as to rebuild Dr. Keenan's medical practice, which had languished during his disability. The creditor (Norwest Financial New York, Inc.) wants a commitment of some of those funds to creditors or to an eventual plan of reorganization. In the *Bradley* case, the Court refused to impose such a commitment where there was no personal service income. Here, although some of the insurance proceeds clearly are non-exempt, pre-petition property of the estate, some of it may be viewed as post-petition "income" of the Debtors, and the issue at bar may be likened to the issue of post-petition personal service income.

Having previously held in the *Bradley* case that even income generated by pre-petition non-exempt assets may be used for the personal living expenses of a Chapter 11 debtor (within the limits of "cause" for conversion, dismissal, appointment of a trustee, etc.), it would seem clear that post-petition personal service income may also be so used. But other courts seem to disagree.

Summarizing existing caselaw as to post-petition personal service income, the court in *In re Harp*, 166 B.R. 740 (Bankr.N.D.Ala. 1993), observed that three views have arisen, each having been

applied in subtly, but critically, different fact situations:

—That all postpetition earnings by the individual Chapter 11 debtor are excluded from the estate by Section 541(a)(6).

—That the debtor's postpetition income should be split under Section 541(a)(6), like the baby before King Solomon, based on exactly HOW the income was generated,

with part being earmarked for the estate, part going directly to the debtor.

—And that all the income flowing to an individual in Chapter 11 becomes property of the estate under Section 541(a)(7) pending confirmation of a plan, just as such property does in a corporate Chapter 11 reorganization.

*Id.* at 749–50 (footnotes omitted).[2]

In the present Court's view, the reason that there is no consensus answer to the question of how much personal service income "belongs" to a debtor and how much to his or her creditors in cases such as this is that it is a question that need not ever be asked, and was not intended by Congress to require judicial resolution in the context of an ongoing Chapter 11 case. The cases themselves leave one wondering why a "federal case" was presented.

For example, in the case of *In re Molina Y Vedia*, 150 B.R. 393 (Bankr.S.D.Tex.1992), the court was asked to approve two competing disclosure statements. One involved a plan proposed by the debtor-physician in which he would commit some of his post-petition earnings toward 40% payment of his general unsecured creditors. The other plan was proposed by a creditor and proposed use of "virtually all of debtors' post-petition earnings attributed to the surgeries he performs towards satisfaction of all unsecured claims." *Id.* at 396. Instead of focusing on what the permissible uses are of property of the estate and on the fact that an individual may not be forced to work for his creditors, the court appeared to agree with the parties' focus on the question of whether the personal service income was or was not property of the estate. (The court concluded that the post-petition personal service income was not property of the estate, and consequently approved the debtor's disclosure statement and disapproved the creditors' disclosure statement.)

In the case of *In re Powell*, 187 B.R. 642 (Bankr.D.Minn.1995), a creditor made a "motion ... to compel the debtors ... to return property to the bankruptcy estate, for an

---

**2.** Nothing that this or any other Court says mitigates the duty of a debtor-in-possession to report and account for *all* income. He or she has no right unilaterally to decide what income is free from the claims of creditors.

accounting, and to establish compensation for the Debtors." *Id.* at 643. The debtors were farmers who, in addition to farming income, also earned wages from off-farm labors. It was only the non-farm earnings that were at issue, and the court ruled that the post-petition wages generated by the individual debtors from their employment were not property of the estate, "and may not be impounded." *Id.* at 647. The present Court believes that if whatever was taken was expended on ordinary necessary living expenses, then there is serious question as to the source from which the creditor thought the "property of the estate" might be returned: If, for example, the money has been spent on food or health care, how can it be "returned" to the estate?

In the case of *In re Angobaldo,* 160 B.R. 140 (Bankr.N.D.Cal.1993), a creditor sought an order from the court "directing Debtor to repay all sums withdrawn from the bankruptcy estate in excess of $3,000 per month." *Id.* at 140. The debtor operated, as a sole proprietor, a business that worked on electrical components, and employed five to seven unskilled workers. The court took evidence and concluded that the debtor's personal efforts accounted for 85% of the proprietorship's business output. It does not explain how the evidence yielded 85%, as opposed to 86% or 40%, for example. Again, the questions of the source from which any excesses would be repaid would have been at issue were it not for the fact that the court forgave the previous "excesses."

Similarly, in *In re Herberman,* 122 B.R. 273 (Bankr.W.D.Tex.1990), the court took evidence of other physicians' earnings and came up with a 75% figure as the debtor-urologist's "personal service earnings" out of the net proceeds of his urology practice. That was in a proceeding in which a group of Dr. Herberman's former business associates made a "Motion to Compel Debtors to Deliver Property to the Estate." Compel delivery to whom, and from where? Debtors-in-possession are "the representatives of the estate," so even assuming that the money is set aside somewhere, to whom is it to be turned over if there is no trustee?

In the case of *In re FitzSimmons,* 725 F.2d 1208 (9th Cir.1984), the bankruptcy court had fixed a $3700 per month salary for the debtor-lawyer from the funds of his law practice and required him to pay certain amounts over to a Chapter 11 trustee. Not only did the higher court find the approach acceptable, but it remanded for lack of evidence that the $3700 was not *too much* to attribute to the personal services of the debtor. It directed that on remand, "the Bankruptcy Court should ascertain the portion of the law practice's earnings that were attributable to [the Debtor's] personal efforts and exclude that amount from the bankruptcy estate. The practice's earnings from all other sources belong to the estate." *Id.* at 1212.

And when a Bankruptcy Administrator in Alabama asked the court to involve itself in the fact that Chapter 11 debtors who are individuals were not complying with the standard "Operating Order" that required them to place all of their funds in a bank account labeled as a debtor-in-possession account, the court found a violation of fiduciary duties, and determined to fix a reasonable rate of compensation for the debtors' family, which the Court referred to as "the bankrupt enterprise," which "salary will be paid as an administrative expense just as it would be for the CEO of a bankrupt corporation." *In re Harp,* 166 B.R. at 756.

The present Court, however, wonders what basis in law there may be to have caused these courts to make such determinations. Why fix percentages? The only question the Court should be asked is whether a debtor's failure to make some suitable provision for sharing the benefits and risks of operating as a debtor-in-possession with his or her creditors constitutes "cause" to convert, to dismiss, to appoint a trustee, or the like. Courts are much better-suited to answer these types of "yes" or "no" questions. And as addressed later, we ought not to be micromanaging the estate.

The approach in the *Harp* case has a parallel to a question often asked of bankruptcy courts (asked, in this Court's view, in vain): What portion of the proceeds of a dairy farm's milk proceeds are attributable to a lender's collateral (the herd, equipment,

crops and feed, for example) as opposed to the value added by the farmer's labor and other forces? Some courts believe that there is an answer to this question. I do not. (I admit having once divined a percentage for short-term adequate protection purposes from a range described by the parties: 35% to the lender, which fell precisely halfway between the two percentages argued by the parties. That was not a coincidence.)

To be intellectually honest when we do such things, we must acknowledge that there is no legal standard for such a decision. We act as arbitrators in such instances, not as judges. Equity becomes our sole guide. There are some instances in which we must so act,[3] but there are others in which we may, and perhaps must, refrain.

### THE COURT MAY REFRAIN FROM RULING

■ The Court is asked to decide how much income the Debtors should commit to what purposes. But Chapter 11 of the Bankruptcy Code initiates and describes a "process" of reorganization that is not to be controlled by the Court. Rather, the end product is shaped by complex dynamics. Among the forces operating are the attitudes of creditors, the policy initiatives of taxing entities or the United States Trustee or Bankruptcy Administrator, the local market for the debtor's goods or services, and even (in many cases such as some retailers and farmers) the weather. The complexity of the statute itself imposes parameters for the interactions and negotiations among the various competing forces.[4] Neither the statute nor the court is an oracle capable of, or charged with, answering all questions that arise during a bankruptcy case, particularly

those dealing with the details of how a particular debtor should reorganize.

It is not surprising that there is nonetheless a desire among bankruptcy attorneys to seek definitive answers to every question that impairs counsels' ability to predict and chart a course for the client. Skilled bankruptcy counsel are ingenious in fashioning ostensible "disputes" that seek answers that are closer to advisory opinions than they are even to declaratory judgments.[5]

For example, in the case of *In re One Canandaigua Properties, Inc.,* 140 B.R. 616 (Bankr.W.D.N.Y.1992), otherwise-opposing counsel served up a friendly motion of a sort that is simply not contemplated by the Code or Rules. It was a motion by the debtor for leave to amend an unconfirmed plan.[6] The motion gave rise to two leading-edge issues (at that time) which the debtor, the lender, and the creditors' committee all would have liked the Court to address: Whether there is a "new value exception" to the "absolute priority rule"; and whether the Court would permit separate classification of a secured creditor's deficiency claim for purposes of meeting the requirement of 11 U.S.C. § 1129(a)(10). This Court refused to answer the question, noting that it would not permit itself to be drawn into the business of drafting plans or into the process of setting the parameters of negotiations by means of issuing something akin to an advisory opinion. It was also explained in the *One Canandaigua Properties* decision how the dispute between the parties might never require a ruling (if, for example, the plan lacked feasibility), and how if the Court were actually to rule, the party who suffers the unfavorable ruling on the "designer dis-

---

**3.** For example, if this case were to convert to Chapter 7 and an argument were to ensue regarding what portion of outstanding receivables (or cash in hand) are the debtors' property and what may the Trustee distribute to creditors, this Court would have to rule on the issue presented in the absence of settlement. And settlement would surely be encouraged by the Court, for such instances cry out for the parties to propose a "fair" split, and for approval by the Court of any reasonable compromise.

**4.** For example, a Chapter 11 debtor must make early decisions regarding executory contracts un-

der 11 U.S.C. § 365, which decisions may greatly affect the future course of the estate and the case.

**5.** Such "designer disputes" are to be distinguished from the fact that many true bankruptcy disputes may be presented in a variety of bona fide ways. For example, there are many different ways to present to a court a valid request to determine the value of an item of collateral.

**6.** 11 U.S.C. § 1127(a) says that when a preconfirmation modification is filed, the modified plan "becomes the plan." No motion is needed.

pute" might have to appeal a later favorable ruling, in order to obtain a meaningful review of the earlier, needless decision.

So to this Court it seems clear that answering supposed "questions of law" that need not and do not necessarily exist may alter the dynamics of the process that Congress created, and may inhibit free negotiation and non-judicial resolution of differing views.

But it is also true that courts must assist parties in avoiding needless expense. One policy must be balanced against the other.

Some of the meaningful considerations in obtaining a balance are embodied in the principle of "standing": "[H]ave the [parties] alleged such a personal stake in the outcome of the controversy as to assure that concrete adverseness which sharpens the presentation of issues upon which the Court so largely depends for illumination of difficult ... questions?" *Baker v. Carr*, 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962). The Courts must ask themselves whether the parties really need a ruling or whether they are just trying to limit the very uncertainties that if left unresolved could promote settlement in a case that indeed "ought" to be settled. Are there "stakes" here that assure the Court that there is optimum advocacy, or should the question be left to a better-illuminated case? Does the "duty to sit" apply here, or is this just an advisory opinion?

Cases elsewhere addressing today's issue provide a study in the creativity of bankruptcy lawyers in enticing judges to rule on issues of law that simply do not exist.[7] As noted above, in one such case an unsecured creditor sought an order directing the debtor to "turnover" property of the estate. A "turnover" action, however, is an action under 11 U.S.C. § 542 to get a non-debtor to turn estate property over to the "representative of the estate." What standing do creditors have to seek a "turnover order" against the representative of the estate? Clearly the motion was intended merely to pressure the debtor.

In the *Bradley* case, the creditors' committee sought an order limiting the debtor-in-possession's personal expense allowance despite the fact that meeting his personal expenses was unquestionably within the "ordinary course" of the financial affairs of his Chapter 11 estate. Again, the purpose was to get the debtor's attention, and perhaps even to inexpensively call the Court's attention to the debtor's personal spending habits, for possible future reference.

Such forays are by no means necessarily improper, but when Congress directed bankruptcy judges to stay out of the administration of estates and to dedicate ourselves only to resolving disputes, Congress did not intend that we elect to resolve every "dispute" that the parties have managed to define for the purpose of getting answers to every question they would like answered about how the estate should be administered.

### THE COURT SHOULD REFRAIN FROM DECIDING THE ISSUE PRESENTED

■ Not only is the Court permitted to refrain from ruling on how much the Debtors here should commit to what purposes, but it ought to refrain.

Creditors have many rights in a Chapter 11 case such as the right to seek appointment of a trustee or examiner; the right to ask the court for leave to prosecute an action on behalf of a recalcitrant debtor; the right to oppose or support various proposals that might shape the case, such as sales, leases, and the like; and the right to propose a plan of their own.

Sections 1107(a) and 1108 of Title 11 U.S.C. might also seem to be a basis upon which creditors may seek court involvement in almost any facet of what a Chapter 11 debtor is or is not doing. Section 1107(a) permits the Court to place limits on a debtor-in-possession's rights. Section 1108 states that, "Unless the court, on request of a party in interest and after notice and a hearing, orders otherwise, the [debtor-in-possession] may operate the debtor's business." Indeed,

---

7. There is no contrivance in the matter at bar. The Debtors had to notify creditors of the settlement, and the creditor was compelled to express its concern about the use of proceeds.

although not citing either § 1107 or § 1108, it was a creditor's "Motion ... to Limit Operation of Debtor's Business" that brought on the § 541(a)(6) issue in the case of *In re Cooley,* 87 B.R. 432, 434 (Bankr.S.D.Tex. 1988) and led to that court's adoption of a mathematical formula by which a certain specified percentage of post-petition profits was determined to constitute "property of the estate," to be "dealt with by the debtor accordingly." *Id.* at 445. While the present Court does not doubt that 11 U.S.C. §§ 1107 and 1108 give authority to the Court to place such limitations on the operating authority of the debtor-in-possession, it does have serious reservations about the propriety of utilizing that authority on a routine basis in a Chapter 11 case of a natural person.

The rights given to creditors by the Code have meaning only if the Court is not needlessly chipping away at what might otherwise be a compelling set of circumstances in the creditor's favor. For example, a creditor may know that a given Chapter 11 debtor, left to his own devices, will soon leave a trail of wantonness and mismanagement that will justify the appointment of a trustee. That creditor should not have to sit idly by, watching a different creditor seek and obtain limitations on the debtor's activities which do not specifically exist in the statute or rules, and which will effectively ensure that the debtor will be able to stay in control of his affairs past the point that the creditor otherwise could have displaced him with a trustee.

Has the court that imposes those limitations well-served the Chapter 11 process? Probably not, given the small percentage of Chapter 11 cases that are successful and the large percentage of Chapter 11 cases that accrue more debt, rather than less debt, during the period that the debtor remains in possession.

Our fondly-remembered colleague Howard Schwartzberg, U.S.B.J., admonished us in an instance like this to apply the statute as written, and let the practical consequences of the debtor's potential imprudence do their work within the statutory parameters. He stated the following, after discussing the *FitzSimmons, Cooley* and *Herberman* cases:

[U]nless or until the legislature chooses to enact an exception for a Chapter 11 sole proprietor to the language contained in 11 U.S.C. 541(a)(6), this court must adhere to the language of the Bankruptcy Code as it is written.

... Those earnings which the debtor receives for services performed are excluded from the Chapter 11 estate by 11 U.S.C. § 541(a)(6)....

.     .     .     .     .

From a creditor's perspective, this interpretation of 11 U.S.C. § 541(a)(6) is not necessarily a prohibition against receiving fair treatment in the Chapter 11 reorganization, although, it might appear to reduce the proceeds available to pay out under the plan. A creditor has several weapons provided by the Bankruptcy Code with which to monitor the Chapter 11 sole proprietor. First, the creditors may seek to have their debt determined to be nondischargeable under 11 U.S.C. § 523, in which case a successful adjudication will allow the creditor to proceed with its nondischargeable claim against the debtor's post-petition earnings. The creditor may also refuse to accept the plan because of the inadequately low payment under the plan....

In addition, a creditor may move to convert the Chapter 11 case to a case under Chapter 7 or dismiss the case pursuant to 11 U.S.C. § 1112. Notably, one of the grounds for conversion or dismissal under 11 U.S.C. § 1112(b)(2) is the inability of the debtor to effectuate a plan. If, as some creditors may argue, without the debtor's earnings for services performed post-petition, there will be almost no funds with which to finance the plan of reorganization, a creditor may move for conversion or dismissal. If the case is converted, then the debtor's prepetition property, which may include homes, cars, shares in a partnership or corporation and jewelry will be liquidated by the Chapter 7 trustee and paid to the unsecured creditors. In the event the case is dismissed, then the creditor can proceed against the debtor the same as it did prior to the filing of the Chapter 11 petition.

*Altchek v. Altchek (In re Altchek),* 124 B.R. 944, 955–56 (Bankr.S.D.N.Y.1991) (footnote omitted).

Judge Schwartzberg thus suggested that we should let the threat or the pendency of a motion to appoint a trustee, or to convert or dismiss the case, temper the debtor's conduct; and we should refrain from judicially micromanaging the debtor's conduct in ways designed to reduce the threat.[8]

## CONCLUSION

■ The Court today must refuse to decide how much of this or other income these Debtors should have to apply to what purposes. Were it not for the fact that the settlement of the insurance claims required notice to creditors, Norwest would not necessarily have known of the receipt of the proceeds other than after the fact. The fact that a creditor has knowledge of the receipt of these monies before they are in fact received, does not change the governing principles of law, which are: (1) even property that clearly is property of the estate may be used in the ordinary course of business or financial affairs of Chapter 11 debtors, even for their personal needs, when the debtors are natural persons;[9] and (2) despite what other courts may say, there is no requirement of law that the debtors commit, on an ongoing basis, any portion of their post-petition personal service income to their creditors or to a Plan of Reorganization. If the Keenans cannot reach accord with their objecting creditors about how the proceeds of these claims will be used, and about how personal service income will be used on an ongoing basis, then the creditors must decide whether to pursue a recognized right (to seek conversion, to seek a trustee, etc.) on that basis. That decision must be made against the background that the Debtors may decide to simply walk away from the Chapter 11 estate, open up practice elsewhere, and let the case be converted or dismissed. The Debtors, of course, must be concerned about any non-exempt asset that will be liquidated and lost if the case is converted, or that might be lost to state court processes if the case is dismissed or if the stay is lifted. Hence, if the Debtors ignore the legitimate concerns of creditors, they do so at their peril.

Those are the dynamics that Congress intended, in the present Court's view. As noted at the outset, the fact that not all questions should be answered does not mean that such questions should not be asked; unless intended to "poison" the Court's perceptions, creditors' concerns should always be on the record, where, as seems to be the same case here, there is no active creditors' committee and the U.S. Trustee seemingly has not expressed an interest in the matter.

This ruling may come as a surprise to the parties. Consequently, Norwest Financial New York, Inc. will have twenty days from the entry of this decision before the Debtors may use these funds—twenty days in which to discuss accord with the Debtors, or to decide to immediately pursue a recognized motion in this Court or to ask the U.S. Trustee or Committee (if any) to take up the reins of such a motion. Thereafter, if no such motion has been filed, the Debtors may use the net proceeds of the claims in the ordinary course of their business or financial affairs, personally or otherwise, without limitation by this Court. But the Court so rules without prejudice to 11 U.S.C. § 549 attack on any uses that occur outside the ordinary course of business or financial affairs, and without prejudice to a later motion by Norwest, or any other party, to make any recognized motion on the grounds of the irresponsible dissipation of such funds, or any other good cause. If any debtor is failing to take

---

**8.** Critics of the present decision will argue that the problem with most Chapter 11 cases is too little creditor interest, and that this decision complains of too much creditor interest (a creditor's asking for intrusion that the Code does not contemplate), and will argue that it saddles the interested creditor with the even greater burden of preparing for a motion to convert, dismiss, etc. That criticism assumes that the Creditors'

Committee or the U.S. Trustee (or Bankruptcy Administrator) will not pick up the reins for a creditor who has negotiated to an impasse with the debtor, and has too little at stake or too few resources to prosecute a motion to convert, or other appropriate relief.

**9.** *In re Bradley, supra* note 1.

prudent steps toward an eventual plan, in good faith, such a motion is welcomed.

SO ORDERED.