**In re Carlos ANGOBALDO, dba Automated Metal Finishing, Debtor-in-possession.**

**Bankruptcy No. 91–57362–ASW–CZ.**

United States Bankruptcy Court, N.D. California.

Sept. 13, 1993.

Wayne A. Silver, Palo Alto, CA.

Walter R. Nelson, Pacifica, CA.

Samuel D. Porter, Armour, Goodin, Schlotz & Macbride, San Francisco, CA.

*DECISION*

ARTHUR S. WEISSBRODT, Bankruptcy Judge.

Wachtmeister, Angobaldo and Malaise Corporation ("WAAM") is a creditor in the above-referenced Chapter 11 bankruptcy case filed by debtor Carlos Angobaldo ("Debtor"), dba Automated Metal Finishing ("AMF" or "the business"). WAAM sought an order from the Court directing Debtor to repay all sums withdrawn from the bankruptcy estate in excess of $3,000 per month, starting from when the petition was filed on November 27, 1991. The Court denied WAAM the relief it requested, but ordered Debtor to limit his withdrawals to $6,000 per month until the Court could hear evidence and determine the issue of whether AMF's post-petition income is property of the estate under § 541 of the Bankruptcy Code.[1]

---

1. Unless otherwise indicated, all chapter and section references are to the Bankruptcy Code, 11 U.S.C. §§ 101 *et seq.*

For the reasons set forth in this Decision, the Court finds that based on the evidence offered at the hearing on this matter, Debtor is the major force behind the generation of AMF's business earnings. The Court holds that Debtor's individual services are responsible for generating eighty-five percent (85%) of the business' post-petition earnings. The portion of AMF's earnings that is generated by Debtor's services, is excluded from being property of the estate under the exception contained in § 541(a)(6) for earnings from services performed by an individual debtor. The calculation of the portion of the post-petition income that is generated by Debtor's services is to be made against AMF's net earnings, that is, the balance of the revenues of the business after deduction of costs and expenses.

The remaining portion of AMF's post-petition income constitutes the "[p]roceeds, product, offspring ... or profits of or from property of the estate" pursuant to § 541(a)(6) that is available to pay claims asserted against the estate by Debtor's creditors.

## I. *BACKGROUND*

Debtor provides a service to manufacturers, primarily companies specializing in computer parts. Debtor receives all kinds of parts, either machine-made or stamped, and finishes them through a process called "deburring."

Through the deburring process, Debtor polishes the parts he receives, removing the sharp edges and microscopic foreign particles, and readies the parts for installation in the customer's final product. The process involves placing parts in tubs that are then loaded into machines along with media (various sizes of stones) and liquids (burnishing and cleaning compounds, etc.). The machines are then "run," which means that they oscillate or vibrate or otherwise move.

Each part must be processed to certain specifications that the customer may change from one time to the next, even with the same part. This requires Debtor to study blueprints that come in with the parts, to evaluate his customers' requirements, and to determine what angles, speeds, quantities, liquids, media and lengths of time in the deburring machines are necessary to achieve the desired finished results. Debtor runs tests, examines processed parts with specialized tools such as a micrometer, and makes corrections until he decides upon the precise procedure for a particular part that will achieve the best results. Debtor then instructs his employees on how to perform the actual processing. Most jobs require Debtor to determine a process that then becomes unique to that job.

The employees load the parts into machines according to Debtor's instructions. After the deburring is completed, the employees remove the parts, dry them, stack them, and box them for return to the customer.

Debtor testified that he has been in the deburring business for approximately ten years. He started in the Los Angeles area working on the sales side of the operation, and also generally learned the deburring process and how to operate deburring machines.

Debtor then moved to the Bay Area where he worked for the prior owner of AMF, Harvey Hoyt ("Hoyt"). Hoyt was the owner of AMF for approximately 30 years. During that time, Hoyt invented machines and developed special and unique processes for use in the deburring business, that he patented. Debtor became Hoyt's partner around 1984, and Hoyt imparted his specialized knowledge and skills to Debtor. Some of Hoyt's patented processes have now expired and are in the public domain. When Hoyt retired, he sold his half of the business to Debtor for $28,000. Debtor has owned AMF since 1987.

Debtor employs from five to seven workers, depending upon the volume of parts to be deburred. The employees of AMF are non-English speaking, unskilled workers who earn the minimum wage. The workers are relatively fungible, in that Debtor can hire and train new unskilled workers as he needs them.

Debtor presented the testimony of Edelberto Gomez ("Gomez"), who has a limited supervisory role with respect to the other workers. Gomez testified through an interpreter that neither he nor the other employees of AMF run the machines without in-

structions from the Debtor nor do they handle customers. Gomez stated that he does not read the instructions that come in with parts to be processed.

At the evidentiary hearing, Debtor testified that he deals exclusively with customers. He stated that he alone sets pricing, repairs the machines, takes care of tracking orders and invoices, pays bills, and hires and fires employees. He testified that what he does *not* do at the present time, is to load and unload the machines, dry parts or box them, although sometimes he does run parts. One customer of AMF testified that Debtor's work was "perfect." The work was something that the customer had tried to do in-house, but he found Debtor's results to be better, less time-consuming and more cost efficient.

Debtor works twelve hours a day, usually six days a week. He indicated on cross-examination that if he were operating the business by himself, he did not believe that he could put out the same volume of work, but yet could approximate it if he were to put even more time in.

WAAM presented the testimony of Lief Johanson ("Johanson"), a former worker who stated that he learned to do deburring from Debtor but deemed the work to be repetitive and boring. He testified that he built deburring machines that he felt worked well because they could do more parts in the same amount of time as Debtor's machines. He implied that the deburring process did not vary much from time to time and once it had been done, a worker could simply repeat the process the next time. On cross-examination, Johanson acknowledged that he primarily ran armatures and did not run very many different kinds of parts during his work experience.

WAAM also presented Robert Read ("Read"), an employment consultant who testified that his task was to explore what it would take to find a manager to run a deburring business like AMF. In his opinion, a manager who would work a normal business week of 40 hours, could be hired for about $30,000 to $40,000 plus an eight to ten percent share of the profits. He was certain that qualified individuals were available, al-

though he had not tried to locate anyone to run AMF.

WAAM then sought to have Read testify as to the value of Debtor's personal services, and Debtor objected that no foundation had been laid for such testimony by Read. The Court ruled that the witness could not testify as to his evaluation of Debtor's ability nor testify as to what percentage of the earnings of the business he believed resulted from Debtor's efforts. The witness did not know Debtor at all and had no basis for evaluating the quality or quantity of his work.

## II. *DISCUSSION*

Based on the evidence presented during the hearing, the Court finds that Debtor's individual efforts account for the major portion of AMF's earnings. Debtor structured AMF's operations, and has continued to manage the business during the bankruptcy case, in such a way that the production of AMF's income is propelled by Debtor's personal knowledge of and attention to all the details of the business.

Consequently, although an inert piece of machinery that clearly is property of the estate is operated through the business' employees, the evidence demonstrated that Debtor calculates how that machine should be loaded with fluid and abraisives, the length of time it should be run, and what adjustments are required to accomplish customer-specific results. AMF's employees perform their tasks according to the plans and procedures generated by Debtor, with minimal deviation from his instructions. Debtor's personal efforts are why customers bring their work to AMF, and as such, his services are what produce most of AMF's income.

Quantifying the input of Debtor into his business in relation to its income, is not an easy task. As noted, no separate testimony from WAAM was admitted on what specific dollar value might be placed on this Debtor's services. In Debtor's view, the absence of any direct evidence from WAAM on this point should be determinative. That is, on that basis the Court should rule that Debtor's personal services account for 100% of the

income generated by the business. The Court disagrees.

The Court heard testimony that the machinery, the equipment, the employees and the specialized processes available to Debtor from the business that Debtor purchased from Hoyt—all contribute to AMF's income. In the Chapter 11 plan that Debtor has filed, Debtor proposes to give creditors the value of the business' hard assets. But this does not resolve the question concerning AMF's post-petition income that is raised by WAAM's motion.

Debtor testified that if he were alone, he could not "put out" as much volume of work. Debtor stated that nevertheless, he believed he could approximate the present output by spending more time at the business. According to the evidence, presently Debtor personally handles every part of the business except loading and unloading the machines, and drying and boxing the parts. Debtor presently works six out of seven days a week. Debtor's personal efforts account for, by far, the largest share of the income of AMF.

From the evidence presently before the Court, the Court concludes that Debtor's personal efforts account for 85% of AMF's business output.

## A. *Applicable Legal Standard*

The legal issue presented by WAAM's motion to limit Debtor's withdrawals from the business income may be stated as follows: When a debtor in business as a sole proprietor enters into Chapter 11, to what extent

are the post-petition earnings of the business property of the estate? That is, how does the § 541(a)(6) exception from property of the estate for earnings from services performed by an individual debtor apply to the sole proprietor now that his business is property of the estate under a Chapter 11 proceeding?

Debtor contends that pursuant to the exclusion from property of the estate contained in § 541(a)(6) for "earnings from services performed by an individual debtor after the commencement of the case," all post-petition income [2] of AMF, which business is his sole proprietorship, constitute his individual earnings. Thus, the Debtor argues that *none* of that income is property of the bankruptcy estate.

WAAM argues on the other hand, that in a Chapter 11 case, a debtor-in-possession has the rights of and performs the functions of a trustee. 11 U.S.C. § 1107. Where a trustee is authorized to operate a business, 11 U.S.C. § 1108, the trustee is entitled to compensation from the estate under § 503(b)(1)(A) for the necessary costs of preserving the estate, including reasonable compensation for his services. WAAM asks the Court to determine what would be a reasonable salary for Debtor to receive for the value of his services to the bankruptcy estate, and to limit his withdrawals from AMF's post-petition income to that amount.

Unlike the specific provisions for an individual debtor doing business who files a Chapter 13 case,[3] the Bankruptcy Code does

2. The few decisions that have been published on the issue raised by WAAM's motion have used such words as "income," "income stream," "earnings," "monies," "revenues," and other similar terms, relatively interchangeably. This raised a question for the Court about whether, for purposes of determining the § 541(a)(6) exclusion from property of the estate for earnings generated by the debtor's services, the Court should look at the sole proprietorship's *gross* revenues or the *net* earnings that result after costs and expenses of operating the business are deducted. *See* discussion at 148–49, *infra*.

3. Congress specifically dealt with the issue raised by WAAM's motion in Chapter 13 filings. Under Chapter 13, the definition of property of the estate is much broader than for other chapters under the Bankruptcy Code. A debtor who is

self-employed and incurs trade credit in the production of income from such employment is engaged in business. A debtor who is engaged in business may operate the business while in Chapter 13. 11 U.S.C. § 1304.

For a debtor in Chapter 13, including one who is engaged in business, property of the estate consists of all property acquired after commencement of the case, as well as all earnings of the debtor. 11 U.S.C. § 1306(a). The debtor may be required to commit all of his disposable income to repayment of his creditors. The disposable income figure is the income received by the debtor that is not required to be expended 1) to maintain or support the debtor, and 2) to continue, preserve, and operate such business. 11 U.S.C. § 1325(b).

Thus, in a Chapter 13 case, all of the debtor's post-petition earnings become property of the

not address the issue of the post-petition earnings of a sole proprietorship in Chapter 11. Only five published cases have dealt with this issue directly, and the five courts have reached somewhat different conclusions, relying on varying theoretical approaches and interpretations of the Code.

The earliest of the decisions on this issue was by the Ninth Circuit Court of Appeals in *In re FitzSimmons*, 725 F.2d 1208 (9th Cir. 1984). In *FitzSimmons*, the Ninth Circuit determined that the § 541(a)(6) earnings exception applied only to that portion of the post-petition income of a sole proprietorship that was attributable to the services "personally" rendered by the debtor to his business. 725 F.2d at 1211.

The *FitzSimmons* decision is binding on this Court. However, Debtor has urged the Court not to use the Ninth Circuit's approach to this issue in his case, but instead to apply the reasoning set forth in two Texas bankruptcy court decisions that were issued subsequently. Before examining *FitzSimmons* in more detail, the Court will review four bankruptcy court decisions on this issue.

### 1. *Two Texas Bankruptcy Court Decisions*

The case on which Debtor principally relies is *In re Cooley*, 87 B.R. 432 (Bankr.S.D.Tex. 1988) (Mahoney, J.). The *Cooley* case involved Dr. Denton A. Cooley, "one of the most famous heart surgeons in the world." 87 B.R. at 434. Dr. Cooley acted as a sole proprietor employing a staff and five other surgeons. The court concluded that Dr. Cooley's own personal efforts "far outweighed the collective contributions of the five associate surgeons." 87 B.R. at 435. The court was impressed by the fact that Dr. Cooley was both the "rainmaker" as well as "was responsible for 41 percent of all surgeries performed in 1987, resulting in approximately 48 percent of the *net* receipts collected by CVA." 87 B.R. at 435 (emphasis added).

The court accepted the legal position promulgated by *FitzSimmons* that a distinction be made between the proceeds of a sole proprietorship that result from its own assets

and those resulting from the personal services of the proprietor. However, the court criticized the Ninth Circuit's interlineation of the word "personally" into the language of the earnings exception. The *Cooley* court concluded that if the Ninth Circuit meant by use of the word personally, that a determination was to made of a figure that would reasonably compensate the debtor for his personal services, then it would reject that interpretation. The court stated that, instead, it is incumbent on the moving creditor to demonstrate that the post-petition earnings are actually "[p]roceeds, product, offspring, rents [or] profits" derived from estate assets. 87 B.R. at 441.

According to the *Cooley* court:

> The earnings exception does not by its language direct that I conduct a valuation hearing to ascertain that portion of the postpetition income stream of a sole proprietorship attributable to the personal services of an individual debtor.... Instead, I hold that once the debtor has met his burden of going forward with evidence to show that under the earning exception: (1) the debtor is an individual, (2) who performs services, (3) which generates earnings, (4) postpetition, *the burden of proof rests upon the creditor* as movant to show that the purported individual debtor's earnings are in actuality "[p]roceeds, product, offspring, rents [or] profits" derived from those assets or other property interests which have previously accrued to the estate by operation of Section 541.

87 B.R. at 441 (emphasis added).

In applying its interpretation of the law to the facts of the case before it, the *Cooley* court went on to find that "Dr. Cooley has met his burden of coming forward with prima facie evidence to show that the earnings from *his medical practice fall within the earnings* exception. [The creditor] must therefore meet its burden of proof that instead of earnings from services[,] such accruals are 'profits' derived from property of the estate." 87 B.R. at 441.

estate, but the debtor is required to commit only the disposable portion to the repayment of credi-

tors through his Chapter 13 plan.

The creditor came forward with evidence, and the court conducted a *FitzSimmons* analysis of the income stream. The court found two identifiable sources of post-petition income that were from *other than* Dr. Cooley's services. They were the estate's fixed assets and the services performed by associate surgeons. The percentage of income that the court determined was derived from the two estate components, and thus would be available to creditors, was 35.1% of the medical practice's total income.

The second case on which the Debtor relies, is *In re Molina Y Vedia,* 150 B.R. 393 (Bankr.S.D.Tex.1992) (Brown, J.). In *Molina,* a surgeon whose sole proprietorship practice generated considerable income but whose investments had soured, filed Chapter 11 with his wife. The debtors proposed a plan funded primarily from income from Dr. Molina's practice, that provided for payment of approximately forty percent on unsecured claims. A competing plan was proposed by their creditors that included virtually all of Dr. Molina's post-petition earnings. Consequently, the bankruptcy court was required to interpret the earnings exception in § 541(a)(6) in deciding which plan to confirm. 150 B.R. at 396.

In *Molina,* the creditors argued that all of the proprietorship's post-petition earnings belonged to the estate and that the debtor should receive a court-imposed salary. The court rejected the creditors' argument. The court went on to determine that because the creditors had offered *no* evidence that the debtor's earnings were anything other than excepted earnings, and because no other professionals were employed by the debtor who might generate earnings, *all* of the proprietorship's post-petition *profits* were debtor's individual earnings from his personal services rendered after commencement of the case. 150 B.R. at 402.

The court recognized that the building in which debtor operated his practice and his equipment were clearly property of the estate, but determined that in the absence of any evidence *from the creditors* to quantify their value, that property did not contribute to the post-petition income stream. 150 B.R. at 402. The court concluded that because of the § 541(a)(6) exception, none of the earnings from Molina's sole proprietorship were property of the estate. 150 B.R. at 403.

### 2. *Other Bankruptcy Court Decisions*

In a recent decision out of New York, *In re Altcheck,* 124 B.R. 944 (Bankr.S.D.N.Y.1991) (Schwartzberg, J.), the bankruptcy court was required to reach the § 541(a)(6) issue in the context of whether a debtor's post-petition earnings within his sole proprietorship were property of the estate and as such, were protected by the automatic stay from an ex-wife's actions to enforce a spousal support obligation. The bankruptcy court ruled that the post-petition sole proprietorship earnings of the debtor were not property of the estate.

The court dealt with the earnings exception issue on a very theoretical basis and never fully described the nature of the debtor's sole proprietorship other than to state that debtor was "a certified public accountant devoting substantial time to real estate development and investment." 124 B.R. at 950. Without providing elaboration of how it reached its conclusions in relation to the facts before it, the court expressed its duty to follow the Code, and declared that all post-petition earnings of a sole proprietorship from services individually performed, belong to the debtor. 124 B.R. at 956–57.

The decision in *Altcheck* framed the distinctions under the Code that the court stated must be made:

> In essence, an interpretation of 11 U.S.C. § 541(a)(6) in the context of a Chapter 11 sole proprietorship serves to divide the debtor into two entities: the debtor, as an individual who receives earnings for services he or she performs after the commencement of the case and the debtor, as a sole proprietor who continues the sole proprietorship and receives proceeds, offspring, products, rents and profits. Those earning[s] which the debtor receives for services performed are excluded from the Chapter 11 estate by 11 U.S.C. § 541(a)(6). However, property of the Chapter 11 estate includes, under 11 U.S.C. § 541(a)(1), "all legal and equitable interests of the debtor in property as of the commencement of the case", as well as

"proceeds, product, offspring, rents, and or profits of or from property of the estate ..." as set forth in 11 U.S.C. § 541(a)(6). Thus, a chapter 11 sole proprietor estate includes all pre-petition property of the debtor, both individually and as a sole proprietor, plus proceeds and profits from the property which come to fruition post-petition, with the only exclusion being post-petition earnings of the debtor acquired as a result of his or her services. 124 B.R. at 955–56.

The court in *Altcheck* recognized that its interpretation of § 541(a)(6)—that the post-petition earnings of the debtor are excluded from the estate—might appear to reduce the proceeds available to be paid out under a Chapter 11 plan. But the court opined that from a creditor's perspective, it would not necessarily preclude fair treatment in the Chapter 11 reorganization.

The court identified several weapons available to the creditor to monitor the Chapter 11 sole proprietor, including: seeking to have its debt declared nondischargeable; refusing to accept the plan because of inadequately low payment under the plan; moving to convert the case to Chapter 7 (in which case the debtor's prepetition property such as homes, cars, jewelry, and shares in a partnership or corporation could be liquidated by a Chapter 7 trustee to pay creditors); or moving to dismiss the case. The court noted that one ground for conversion or dismissal is the inability to effectuate a plan. 124 B.R. at 956.

A year before the decision in *Altcheck* was issued, a bankruptcy court in Texas had decided *In re Herberman*, 122 B.R. 273 (Bankr. W.D.Tex.1990) (Clark, J.). The *Herberman* case involved a doctor acting as debtor-in-possession. The court applied a completely different rationale and analysis from the other cases that have dealt with this issue, and reached a totally opposite result.

The court in *Herberman* developed a statutory analysis pursuant to which it interpreted § 541(a)(6) in conjunction with § 541(a)(7) to determine that *all* post-petition earnings of a sole proprietorship are *property of the estate.* The court then backed out from what was included as property of the estate, "*such*

[proceeds, product, offspring, rents and profits] as are earnings from services performed by an individual debtor." 122 B.R. at 278 (emphasis in original). Under the *Herberman* court's analysis, the debtor-in-possession acts as a fiduciary of the sole proprietorship estate, and is entitled to draw a salary from the estate for his services to it.

According to the court in *Herberman*:

Our task is ... relatively simple. We merely decide how much to pay the debtor for services performed. That analysis is controlled by § 503(b)(1)(A), which advises, in essence, that actual and necessary costs may be allowed as an off-the-top administrative expense. 11 U.S.C. § 503(b)(1)(A). It is a task upon which courts have embarked before in corporate and partnership cases. The approach need be very 'little different in the individual debtor case.

122 B.R. at 287. The court went on to adopt the approach that wages actually paid should be subject to court scrutiny and made to conform to a standard of "reasonableness." *Id.* The *Herberman* court completely discounted the debtor's objection to its analysis as being violative of the prohibition against involuntary servitude, which the court labeled a "shibboleth".

The result in *Herberman* is what WAAM has argued should be the decision in the pending case, but on a different analytical basis. The court in *Altcheck* summarized the *Herberman* decision and implied that it ran contrary to the Bankruptcy Code. "[U]nless or until the legislature chooses to enact an exception for a Chapter 11 sole proprietor to the language contained in 11 U.S.C. [§] 541(a)(6), this court must adhere to the language of the Bankruptcy Code as it is written." 124 B.R. at 955. *See also Molina*, 150 B.R. 'at 397–99 (disagreeing with *Herberman* on the basis that it narrows the earnings exception to the point of extinction and is contrary to Congress' clear intention not to implicate the Thirteenth Amendment prohibition against involuntary servitude).

3. *Ninth Circuit Court of Appeals' Decision in FitzSimmons*

The Court now turns to *FitzSimmons*, 725 F.2d 1208, decided by the Ninth Circuit

Court of Appeals in 1984. In *FitzSimmons,* an attorney acting as a sole proprietor opposed the Chapter 11 trustee's position in the case that § 541(a)(6) "entitled [the debtor] only to whatever salary the estate or the bankruptcy court allocates to him." 725 F.2d at 1210. The trustee had asserted the legal theory that the earnings exception was overridden in the context of a reorganization to entitle the estate, and not the debtor, "to all proceeds from the operation of the debtor's business, even if those proceeds were generated by the services of an individual debtor." *Id.* The trustee's suggestion would have had similar effects as the position ultimately adopted by the court in *Herberman.*

The *FitzSimmons* court rejected this approach on the ground that the Bankruptcy Code applies § 541(a)(6) to Chapter 11 cases and makes no exception for sole proprietorships. The court noted that "Congress knew how to override this general applicability of § 541(a)(6) when it wanted to do so.... If Congress had intended to make the earnings exception inapplicable to Chapter 11 cases ... it would have done so explicitly, as it did in § 1306." 725 F.2d at 1211.

The matter was remanded to the bankruptcy court for it to determine what proceeds of FitzSimmons' law practice were attributable to the services personally rendered by the debtor himself. That amount was to be excluded from the bankruptcy estate, with the practice's earnings from all other sources to belong to the estate. 725 F.2d at 1211–12. Thus, the court ruled that, "FitzSimmons is ... entitled to monies generated by his law practice only to the extent that they are attributable to personal services that he himself performs. To the extent that the law practice's earnings are attributable not to FitzSimmons' personal services but to the business' invested capital, accounts receivable, good will, employment contracts with the firm's staff, client relationships, fee agreements, or the like, the earnings of the law practice accrue to the estate." 725 F.2d at 1211.

In crafting its interpretation of § 541(a)(6), the Ninth Circuit expressed concern that the broad interpretation advanced by the debtor—*i.e.,* all of the earnings generated by the law practice belonged to him under the earnings exception—would work a hardship on creditors who look to the estate for satisfaction of their claims. The court felt that under the debtor's statement of the scope of the earnings exception, creditors would not enjoy the benefit of any profits earned by a sole proprietorship operated under Chapter 11, as they would with a corporation or partnership debtor. Yet at the same time, creditors would be expected to bear any losses since such losses would reduce the value of the estate's assets.

### 4. *Comparison of Cases*

■ As can be seen from the results reached by courts that have addressed this issue, the application of § 541(a)(6) to the sole proprietor debtor in a Chapter 11 reorganization has generated varying analytical interpretations. However, with the exception of *Herberman,* which has been criticized in two later decisions as being inconsistent with the Code and Congressional intent, the Court concludes that the bankruptcy court opinions subsequent to *FitzSimmons* are not inconsistent with the Ninth Circuit's interpretation of the earnings exception. That is, the post-petition income stream of a sole proprietorship is to be allocated between that which is generated by the individual debtor's services, and that which is proceeds, profits, etc. from estate assets.

The major distinction between *FitzSimmons* and the several bankruptcy court decisions, is that the courts in *Cooley* and *Molina* adopted a presumption, also impliedly accepted by *Altcheck,* that all post-petition earnings are property of the individual debtor, *except* as they are established to be attributable to estate assets. The two Texas bankruptcy courts held that the burden is on the creditor to bring back into the estate the portion of the post-petition earnings that are not generated by the individual debtor's services. The New York court never reached the application of the exception to the facts before it and simply ruled that all of the income belonged in that case to the debtor.

In *FitzSimmons,* on the other hand, the court of appeals stated that the bankruptcy court was to determine what portion of the

post-petition earnings were attributable to the debtor's personal efforts, and that portion would then be excluded from the estate. But the Ninth Circuit made no direct statement about whether there was any presumption with respect to the initial inclusion, or exclusion, of a sole proprietorship's post-petition earnings.

With respect to the "valuation" of an individual's personal services that the court in *Cooley* attributed to the Ninth Circuit's decision in *FitzSimmons*, this Court does not read the Ninth Circuit opinion as compelling such an evaluation. Salaries normally are tied to the value of services provided, and in *FitzSimmons*, the court of appeals clearly rejected the notion that the debtor was to be paid a salary for his services to the estate. Moreover, the matter was not remanded to the bankruptcy court for a valuation hearing, but rather "for calculation of the amount of earnings of FitzSimmons' law practice that are attributable to services personally performed by FitzSimmons." 725 F.2d at 1212.

Thus, the main difference between the cases is the presumption specifically adopted by the bankruptcy courts subsequent to *Fitz-Simmons* and the burden those courts placed on creditors as a result.

### 5. *Burden of Proof*

At the start of trial on the matter pending before this Court, Debtor asserted that he should not have to go first. However, instead of relying on the *Cooley* and *Molina* presumptions, Debtor argued that WAAM's motion was in the nature of one seeking turnover of money to the estate. Thus, under common law and bankruptcy law principles, the burden of proof would be on the party seeking to recover funds.

In response, WAAM noted that *FitzSimmons* did not specify who had the burden, but suggested that the case impliedly held that it would be on the debtor who was

seeking to except the funds from his creditors. Furthermore, here Debtor was claiming that *all* income was the result of his personal services and as such, WAAM argued that Debtor should have to carry the burden of proving that.

Without ruling on who has the burden of proof, and instead specifically reserving that issue, the Court stated that who went first at trial need not be correlated with who had the burden of proof. The Court decided that it would·be fair in this case to require Debtor to go first, and did so.

Debtor then put his evidence into the record of the extent of his personal efforts in the operation of the business that generate post-petition income. From that evidence, as well as what was elicited on cross-examination, the Court reached its decision in this case based on the preponderance of the evidence presented at trial, but without regard to who had the burden of proof. Thus, while that issue was reserved, the Court does not need to rule on it to resolve this matter.[4]

### B. *Application of the Legal Standard*

In *FitzSimmons*, the Ninth Circuit Court of Appeals remanded the case for the bankruptcy court to calculate the amount of earnings of the business that were attributable to services personally performed by the debtor. However, neither *FitzSimmons* nor any of the published decisions that accept the Ninth Circuit's concept that the business income may be divided between the debtor and the estate, specifically discuss whether the apportionment is to be made against a sole proprietorship's gross income or its net earnings.

Rather, the *FitzSimmons* court stated at one point that, "FitzSimmons is thus entitled to *monies generated* by his law practice only to the extent that they are attributable to personal services that he himself performs."

---

4. The Court notes that if Debtor believed that the presumptions set forth in *Cooley* and *Molina* controlled the Court's decision in this matter, and wanted to rely upon that principle, Debtor could have rested his case and turned the proceeding over to WAAM to establish the nature of AMF's post-petition earnings. Then Debtor could either have rebutted WAAM's evidence, or,

if WAAM merely presented the evidence that it subsequently did here of what salary it would take to put a manager into the business or that nothing the Debtor did was particularly unique, Debtor could have argued that WAAM failed to carry its burden and that none of the post-petition earnings belonged to the estate.

725 F.2d at 1211 (emphasis added). At another point in the decision the court stated, "[T]he Bankruptcy Court should ascertain the portion of the law practice's *earnings* that were attributable to FitzSimmons' personal efforts and exclude that amount from the bankruptcy estate. The practice's *earnings from all other sources* belong to the estate." 725 F.2d at 1212 (emphasis added).[5]

*FitzSimmons* does not provide clear direction on how this apportionment is to be taken, and the Court recognizes that the answer can have significant practical consequences for the creditors of an estate.

By way of example, because the Court has determined in this case that Debtor's efforts are responsible for generating 85% of AMF's earnings, if the expenses of the business are deducted and then the allocation is made against the remaining funds, creditors would expect to receive approximately 15% of AMF's post-petition profits.

But if, instead, that 85% allocation is made against the business' gross receipts, and if the operational expenses of the business require, for example, a full 60% of those gross receipts, then a conflict exists. As a practical matter, creditors would likely receive none of the post-petition earnings of the business. It is conceivable in such a situation that only through the debtor's willingness to re-dedicate of a portion of his post-petition earnings to the business, could much be offered to creditors through Chapter 11 where the sole proprietorship is to be operated as opposed to being sold as a going concern, or liquidated. That commitment of earnings is what the debtors in *Molina* proposed for their creditors. 150 B.R. at 396. The court in *Altcheck* acknowledged the problems that this issue could pose for creditors and identified several strategies that might be employed in rebuttal. 124 B.R. at 956.

With respect to this issue, WAAM noted that pursuant to § 541(a), *all* revenues generated by an *operating business* would be included in the definition of estate property and not just the net amounts after deducting the costs of the business operation. WAAM

then posited that the portion of the revenues attributable to the individual's efforts for a sole proprietorship business would necessarily have to be carved from the *net* revenues because the Court should place a "value" on those efforts instead of attributing income to them.

Relying on the absurdity of any other approach and because of the emphasis WAAM believed the court in *FitzSimmons* placed on valuation, WAAM went on to argue that this Court should estimate the worth of Debtor's personal services and direct that he be paid reasonable compensation for his services to the estate. The net business income remaining after paying this salary would then belong to the creditors of the estate.

Predictably, and consistent with its position on this issue throughout these proceedings, Debtor acknowledged in its brief that all of a normal business debtor's income is property of the estate subject to claims of its pre- and post-petition creditors. However, Debtor argued that where the debtor is a sole proprietorship, only the gross proprietorship income that is *not earnings* of the individual, is *included* in the estate so as to be subject to creditor claims.

Additionally, Debtor argued that the carve out of monies generated by a debtor's personal services must be made against the full post-petition income of the business rather than its net earnings to avoid running afoul of the prohibition against involuntary servitude. Accordingly, Debtor argued that if he is forced to fund the operation of the business from what he believes to be his non-estate earnings, that would violate the Thirteenth Amendment.

In the Court's view, neither WAAM nor the Debtor has offered a persuasive analytical basis for selecting either gross or net income for the apportionment that the holding in *FitzSimmons* requires the Court to make.

On the surface, WAAM's citation to *Fitz-Simmons* for the proposition that the Court of Appeals emphasized valuing a debtor's

---

**5.** The Court notes that the courts in both the *Cooley* and the *Molina* decisions generally worked with net figures or profits, which they

determined to be excluded from property of the estate except to the extent that a creditor established that they belonged within the estate.

services, is consistent with the *Cooley* court's statement of the *FitzSimmons* holding. *See Cooley*, 87 B.R. at 439. However, *FitzSimmons* does not require the type of valuation of a debtor's services that WAAM asserts it does.

Rather, the Ninth Circuit Court of Appeals flatly rejected the salary approach advocated by WAAM, 725 F.2d at 1210, and remanded the case to the bankruptcy court to "ascertain the *portion* of the law practices *earnings* that were *attributable* to FitzSimmons' *personal efforts* and *exclude* that amount from the bankruptcy *estate.*" 725 F.2d at 1212 (emphasis added).

■ As for Debtor's Thirteenth Amendment argument on this issue, the Court finds it unpersuasive for several reasons. First, as will be seen, the Court concludes that the carve out for personal earnings mandated by *FitzSimmons* must be taken against the *net* earnings of the sole proprietorship. The effect of this conclusion is that no portion of a proprietor's earnings are taken away from him for the benefit of his creditors because the costs to operate the business are deducted before the individual debtor's earnings exception is calculated.

Next, Debtor had many options available to him. He could have filed Chapter 7 and within the constraints of that Chapter, "walked away" from his obligations. He may have been able to establish eligibility for Chapter 13 and received the many benefits available under that chapter while continuing to operate his business. Even under Chapter 11, he could have sold his business as a going concern or liquidated it, and may still elect to do so.

Instead, this Debtor made the decision to bring his business into bankruptcy under Chapter 11, and he chose to continue to operate it. No one forced this Debtor to run his business in such a way that it would require a significant amount of revenues generated post-petition to keep it operating. While this Debtor's choices may have been limited, other options were not foreclosed to him. The Debtor has not been compelled to labor for another against his will in the sense that there is involuntary servitude in violation of his Thirteenth Amendment rights.

To resolve the question of how to apply the apportionment required by *FitzSimmons*, the Court turned again to the Ninth Circuit Court of Appeals' language and policy considerations expressed in that case. The Ninth Circuit stated its concern about the problems created for creditors when a sole proprietor seeks to use Chapter 11 to reorganize but at the same time claim all of the income of the business as his personal earnings. To avoid an "anomalous result", the court refused to read the earnings exception in such a way as to "preclude operation of sole proprietorships under Chapter 11." 725 F.2d at 1211. The court did not want the creditors of the estate to be required to bear the losses while not enjoying any of the profits earned while the sole proprietorship was operated under Chapter 11.

Although the language in *FitzSimmons* initially mixed such terms as income and monies together with earnings, in its statement of the task of the bankruptcy court on remand to effect an apportionment, the court of appeals consistently used the term "earnings." 725 F.2d at 1212. That term is defined for common usage as "the balance of revenue for a specific period that remains *after* deducting related costs and expenses incurred." *See, e.g.,* Webster's Third New International Dictionary (Unabridged) (1986) (emphasis added).

■ Thus, the Court holds in this case that the allocation of the 85% of the business income that has been established to be attributable to Debtor's personal services, will be taken from AMF's net earnings, and not against AMF's gross post-petition income.[6] According to Debtor's Operating Reports for

---

6. This Decision addresses only § 541 property of the estate issues. It does not reach plan confirmation issues such as whether the Debtor is offering through the plan to his creditors the full value of the business in order to meet the Chapter 7 liquidation test, etc. Those issues are not yet before the Court. Also, this Decision does not resolve a motion from WAAM (for an order temporarily allowing its claim) or one from the Debtor (to designate WAAM's claim), both of which were filed after this matter was taken under submission. Those two motions will be resolved by separate Order.

the period from December 1991 to the end of February 1993 (admitted into evidence as Exhibits C through Q), AMF's post-petition net income, or profit, totalled: $8,917.15 for 1991; $177,206.21 for 1992; and $71,886.13 for 1993 through the end of February.

■ As a final matter, Debtor urged that if the Court were to find in WAAM's favor on this issue (and thus arguably to find that any portion of AMF's post-petition earnings are property of the estate), such decision should not be made retroactive. Debtor argued that WAAM should not be allowed to have delayed in raising questions concerning AMF's post-petition earnings until after Debtor had put substantial efforts into generating them, only to benefit from his efforts.

The Court declines to make this Decision prospective only. The record does not reflect inordinate delay on WAAM's part in questioning Debtor's use of post-petition earnings from AMF. Furthermore, the Debtor has not provided any authority for applying equitable considerations to a decision under the Bankruptcy Code about what is property of an estate and what is excluded. In any event, the Court has not accepted WAAM's interpretation that § 541(a)(6) limits a sole proprietor to receiving a salary from the estate.

### III. *CONCLUSION*

This Decision shall constitute the Court's findings of fact and conclusions of law in accordance with Bankruptcy Rule 7052, made applicable to contested matters under Bankruptcy Rule 9014. Counsel for the Debtor shall submit a proposed order consistent with the Court's Decision in this matter.