**In re Stephen G. ATKINSON, M.D. and Karen Marie Atkinson, Debtors.**

No. 99–21086.

United States Bankruptcy Court, D. Idaho.

Feb. 6, 2001.

Bruce A. Anderson, Elsaesser, Jarzabek, Anderson, Marks & Elliot, Chtd., Sandpoint, ID, for Stephen G. Atkinson and Karen Marie Atkinson.

T.J. Frasier, Landeck, Westberg, Judge & Graham, P.A., Moscow, ID, for C. Barry Zimmerman, Chapter 7 Trustee.

Gary L. McClendon, Boise, Idaho, Office of the United States Trustee.

## MEMORANDUM OF DECISION

TERRY L. MYERS, Bankruptcy Judge.

## INTRODUCTION

Stephen Atkinson is a general and vascular surgeon. He and his wife Karen Atkinson ("Debtors") filed a petition for relief under chapter 11 on September 7, 1999. They converted their case to chapter 7 on March 24, 2000.

Chapter 7 Trustee, C. Barry Zimmerman ("Trustee"), has moved for turnover of certain "accounts receivable" which were accrued by Dr. Atkinson through his medical practice and which existed on the date of conversion. The Trustee asserts that turnover is appropriate because these accounts are property of the estate under §§ 541(a)(1), (6) and (7). The U.S. Trustee has objected to Debtors' attempted exemp-

tion of a portion of the accounts receivable.[1] The Debtors resist the Trustee's motion and the U.S. Trustee's objection.

Hearings have been held, concluding with one on December 19, 2000. No testimony was presented in open court. The parties rely on certain documents (Exhibits 1 through 4), the affidavit of Dr. Atkinson (*sans* cross examination), pleadings of record, and pre-hearing and post-hearing briefing.

This decision constitutes the Court's findings of fact and conclusions of law. Fed. R. Bankr.P. 9014, 7052.

## FACTS

The Debtors' sole source of income is Dr. Atkinson's medical practice, which is operated as a sole proprietorship. Mrs. Atkinson does not work in the practice or otherwise.[2] The Debtors served as debtors in possession in the chapter 11, and Dr. Atkinson maintained his medical practice throughout the duration of this entire case.

Dr. Atkinson's medical practice generated what he has characterized as "accounts receivable" or, at times, "patient fees." *See, e.g.,* Exhibit 3. Many of these accounts have been collected, some have been written off, and a fair amount remain on the books. Though the factual record is in many regards confusing,[3] the Court relies on the stipulated Exhibits and Dr. Atkinson's unassailed affidavit testimony in order to establish the facts of the matter.

Exhibit 1 is entitled "Collection on Pre–September 7, 1999 Accounts Receivable" and establishes that $6,993.83 of accounts receivable existed on the date of the initial filing of the chapter 11 petition and that, of

---

1. The U.S. Trustee and the Trustee support one another in their respective contentions.

2. Exhibit 4, the Debtors' 1999 federal tax returns, indicates on p. 2 Mrs. Atkinson's occupation as "R.N./Administrat[or]" but there was no evidence of work performed or income generated by her during the bankruptcy.

3. The parties have bandied about several sets of figures. It seems as if accurately accounting for amounts billed and cash received has been inordinately difficult, and that the important figures on critical dates are constantly moving targets.

this amount, $6,128.30 was collected by the Debtors during the chapter 11.[4]

Exhibit 2, the Debtors "Final Report and Account" filed under Fed.R.Bankr.P. 1019 and LBR 1019.1, indicates *via* an attached copy of an amended schedule B that $38,382.33 in outstanding accounts receivable remained uncollected at the date of conversion in March, 2000. Dr. Atkinson's affidavit of December 14, 2000 later corrected this figure to $44,483.98. He also indicated that another $17,335.45 of receivables remains on the books which he deems uncollectible. *Id.* at ¶ 4, p. 2. The Court concludes that $61,819.43 in accounts receivable existed on March 24, 2000, the date of conversion. This is, at least initially, the *res* subject to the turnover demand.

Exhibit 2 also reflects that during the life of the chapter 11 case, $83,199.48 was paid or transferred to the Debtors. This amount appears to result from collection of pre-bankruptcy accounts receivable (*i.e.*, the $6,128.30 discussed above) and collection of accounts receivable which were generated after filing. But this $83,199.48 clearly is not gross income; the Debtors collected far more than that, according to Exhibits 2 and 3, and paid certain business expenses while the chapter 11 was pending before paying themselves. But neither is $83,199.48 necessarily a fully accurate "net income" figure, as there is doubt on this record that all expenses related to the business were accounted for and paid.[5]

## DISCUSSION

### Pre-petition accounts

■ Section 541(a)(1) provides that "[a]ll legal or equitable interests of the debtor in property as of the commencement of the case" become property of the debtor's estate. Therefore, the portion of the Debtors' accounts receivable generated pre-petition became property of their estate upon filing on September 7, 1999. *In re Grewal*, 96.4 I.B.C.R. 146 (Bankr.D.Idaho 1996). *Accord, In re Ryerson*, 739 F.2d 1423, 1426 (9th Cir.1984).

The Debtors claim that these pre-petition accounts receivable are subject to the exemption provided by Idaho Code § 11–207(1).[6] Section 11–207 states:

> **Restriction on garnishment—Maximum.**—(1) Except as provided in subsection (2) of this section, the maximum amount of the aggregate disposable earnings of an individual for any work week which is subjected to garnishment shall not exceed (a) twenty-five per cent (25%) of his disposable earnings for that week, or (b) the amount by which his disposable earnings for that week exceed thirty (30) times the federal mini-

**4.** This Exhibit indicates $6,128.30 was "paid" and that $865.53 was "written off." This totals $6,993.83. The purported total on Exhibit 1 of $5,428.30 (which Debtors in their briefing "concede" represents pre-bankruptcy accounts which they collected) is not reconciled to the entries themselves.

**5.** The cash flow during the chapter 11 is the subject of much discussion, especially on the part of the Trustee. It is also addressed in the documents before the Court, particularly Exhibit 2 (the Final Report and Account) and Exhibit 3 (the Debtors' monthly financial report for the period ending 2/29/00, the last such report before conversion). But the focus of the turnover motion and the issue of characterization of property under § 541(a)(6) has not been on the accounts collected and spent but, rather, on the amount outstanding on March 24, 2000, which is $61,819.43. More

to the point, the focus is on the $44,483.98 the Debtors assert is collectible.

**6.** The Court appreciates that, in general, the exemption issues were put on hold by the parties while the issue of characterization of the post-petition accounts receivable under the "earnings exception" of § 541(a)(6) was addressed. However, the earnings exception has no relevance to the accounts receivable that were generated before and existed on September 7, 1999. Additionally, the Court considers and rejects, *infra*, the objectors' several arguments that the source of Dr. Atkinson's receivables is other than his personal labors and services. Those determinations are incorporated here by reference to the extent relevant to the issue of exemption of pre-petition accounts under § 11–207(1) and *In re DeBoer*, 99.3 I.B.C.R. 101 (Bankr.D.Idaho 1999).

mum hourly wage prescribed by 29 U.S.C.A. 206(a)(1) in effect at the time the earnings are payable, whichever is less. In the case of earnings for any pay period other than a week, the Idaho commissioner of labor shall by regulation prescribe a multiple of the federal minimum hourly wage equivalent in effect to that set forth in (b) of this subsection.

Statutory definitions, including that for "earnings," are as follows:

Definitions.—For the purpose of section 11–207, Idaho Code, the term:

1. "Earnings" means compensation paid or payable for personal services, whether denominated as wages, salary, commission, bonus, or otherwise, and includes periodic payments pursuant to a pension or retirement program.

2. "Disposable earnings" means that part of the earnings of any individual remaining after the deduction from those earnings of any amounts required by law to be withheld.

3. "Garnishment" means any legal or equitable procedure through which the earnings of any individual are required to be withheld for payment of any debt.

Idaho Code § 11–206.

■ Although "accounts receivable" is not expressly included in the definition of "earnings" under § 11–206(1), this Court has held that:

[S]o long as the subject "receivable" was actually derived from the personal services of the debtor, it is exempt to the degree provided in the statute. The matter is, in the final analysis, one of proof of the facts surrounding the creation of the account receivable and to what extent the account receivable does or does not reflect compensation for personal services.

. . .

If the obligation is for the personal services and labor of the debtor, the Idaho legislature has provided for an exemption of 75% of that amount. It does not matter whether it is called compensation, salary, bonus, wage, commission, or "account receivable" so long as the factual predicate is established as a matter of record.

*DeBoer* at 103–04, *citing In re Grewal,* 96.4 I.B.C.R. 146 (Bankr.D.Idaho 1996).

■ Thus, the focus is not on the words used to describe the obligation, but rather on how the obligation was generated. If the obligation is found to reflect compensation for personal services and labor of the debtor, § 11–207(1) provides an exemption of 75% of that amount.

■ Exemptions are to be liberally construed in favor of debtors. *DeBoer,* 99.3 I.B.C.R. at 104. The objector to the claim of exemption bears the burden of establishing that it is improperly claimed. *Id.* at 102, 105; Fed.R.Bankr.P. 4003(c).

■ The objectors have not established that any of the accruals as of the date of the filing of the chapter 11 petition for relief represent anything other than compensation to Dr. Atkinson for his personal labors.

Therefore, Debtors will be allowed to exempt 75% of the pre-petition accounts receivable. As found above, the pre-petition accounts receivable actually paid the Debtors amounted to $6,128.30. The Debtors must turnover to the Trustee the sum of $1,532.08.[7]

*Post-petition, but pre-conversion, accounts*

■ The Debtors seek to use § 541(a)(6) to exclude from property of the estate all the accounts receivable generated post-petition and existing on conversion (*i.e.,* $61,819.43).[8] This section provides:

---

7. The Debtors are also entitled to 75% of any other pre-petition accounts receivable. But, as to the $865.53 which was written off, the exemption has no practical benefit, and nothing in the record indicates any other pre-September 7, 1999 receivables are at issue.

8. The Debtors initially claimed, in an amended schedule C included within their Final

(a) The commencement of a case under section 301, 302, or 303 of this title creates an estate. Such estate is comprised of all the following property, wherever located and by whomever held:

. . .

(6) Proceeds, product, offspring, rents, or profits of or from property of the estate, **except such as are earnings from services performed by an individual debtor after the commencement of the case.**

Section 541(a)(6) (emphasis supplied). Simply put, a debtor is allowed to keep any earnings generated after the commencement of the case, so long as the earnings can be attributed to personal services actually performed by that debtor. *Grewal,* 96.4 I.B.C.R. at 146, citing *In re FitzSimmons,* 725 F.2d 1208, 1211 (9th Cir.1984). The Trustee and the U.S. Trustee oppose the Debtors' contention that the post-filing accounts receivable qualify under this earnings exception. Their first argument is that "accounts receivable" cannot be considered as falling within the statutory language of "earnings from services performed by [Dr. Atkinson] after the commencement of the case." They point to the language in *FitzSimmons* which included "accounts receivable" among types of income that may be attributable to sources other than personal services:

> [W]e hold that § 541(a)(6) excepts from the proceeds of the estate only those earnings generated by services performed by the individual debtor. FitzSimmons is thus entitled to monies generated by his law practice only to the extent that they are attributable to personal services that he himself performs. To the extent that the law practice's earnings are attributable not to FitzSimmons' personal services but to the business' invested capital, **accounts receivable,** good will, employment contracts with the firm's staff, client relationships, fee agreements, or the like, the earnings of the law practice accrue to the estate.

725 F.2d at 1211 (emphasis supplied).

This Court has twice before rejected any talismanic import to the use of the term "accounts receivable" or any reflexive reliance on such a characterization when attempting to establish whether the obligation did or did not arise from a debtor's individual labors. *DeBoer,* 99.3 I.B.C.R. at 104; *Grewal,* 96.4 I.B.C.R. at 146. When determining "earnings" for § 541(a)(6) purposes or for § 11–207 purposes, the focus should be "on the manner by which the amount owed the debtor was generated, rather than the words used to characterize that obligation." *DeBoer,* 99.3 I.B.C.R. at 104. *FitzSimmons,* quoted above, is in fact consistent. It recognizes that § 541(a)(6) will except earnings "attributable to personal services that [the debtor] himself performs" and that it is only "[t]o the extent the . . . earnings are attributable not to [the debtor's] personal service" that they will accrue to the estate. *FitzSimmons* at 1211.

The next argument is derivative of the first. The Court is told that the "accounts receivable" should be segregated into those which were generated by, and are attributable to Dr. Atkinson's personal services and those which were generated in some other fashion. However, the Trustee and the U.S. Trustee have failed to prove on the evidence any source of income gen-

Report and Account upon conversion, Exhibit 2, an exemption of 75% of the $38,383.33 they then declared as accounts receivable on the date of conversion. It became clear as the case progressed that the question of this particular exemption was relevant only if these accounts at conversion were found to be property of the estate. The parties therefore agreed to first address the issue of character-

ization of the property under § 541(a)(6)'s earnings exception and to reserve all exemption issues (which included questions as to how the exemption amendment came before the Court, whether objections to exemptions were timely, and so on). By virtue of the Court's conclusions, *infra,* the exemption issues as to these post-petition accounts have been rendered moot.

eration other than Dr. Atkinson's own services.

The Trustee argues that:

> [o]f every dollar the medical practice brings in, a certain portion is used to pay the expenses of the business before the Debtor can enjoy the profits. These expenses include rent, utilities, staff payroll, supplies, etc. This compensation is not attributable to the Debtor's personal services, but to the business overhead. Consequently, this portion of the accounts receivable is property of the estate under § 541(a)(6) as "proceeds, product, offspring, rents, or profits."

See Chapter 7 Trustee's Memorandum Regarding Post–Petition, Preconversion Income as Property of the Chapter 7 Estate (Doc. No. 92) at 8. According to the Trustee, "of the accounts receivable that are collected, 35% are attributable to business overhead rather than the Debtor's personal services." Id.[9] The Trustee thus wants an order requiring turnover of 35% of the accounts existing as of the date of conversion.

The problem with the analysis, from the Court's point of view, is that the factors identified by Trustee (i.e., rent, utilities, staff payroll and supplies) are not sources of income generation. Rather, they are operating expenses.[10] To acknowledge that expenses are necessarily incurred in the process of generating income is reasonable; to characterize such expenses as reflecting, creating or being a source of income is not.

The Trustee believes that In re Angobaldo, 160 B.R. 140 (Bankr.N.D.Cal.1993) supports his analysis. In that case, evidence presented at hearing convinced the court that 15% of the earnings generated by the debtor's business resulted from factors other than the debtor's personal services. Id. at 141–43.[11] "The Court heard testimony that the machinery, the equipment, the employees and the specialized processes available to Debtor from the business the Debtor purchased from Hoyt—all contribute to AMF's income." Id. at 143.

But it was not the expense the business incurred by virtue of the equipment or labor force that was key to this finding. Rather, Judge Weissbrodt found from the evidence that the use of the deburring equipment by employees other than the debtor personally, and those employees unloading, drying and boxing the parts, generated income to the debtor's proprietorship.

Angobaldo did not establish the proposition urged by the Trustee—that expenses of labor, equipment costs, or other overhead were a source of income. Rather, Angobaldo only established that a portion of the total business income resulted from other than Angobaldo's personal labors.

It is of course conceivable that some accounts receivable in a medical practice could be attributable to something other than the doctor's personal services as a physician.[12] Perhaps in a manner rough-

---

9. The Trustee generates his 35% estimate by comparing the medical practice's expenses during the chapter 11 with the practice's gross income, and arriving at a "weighted average." Id.

10. Operating expenses are defined as "[t]he cost of operating a business, such as rent, wages, utilities, and similar day to day expenses, as well as taxes, insurance, and a reserve for depreciation." Black's Law Dictionary 577 (6th ed.1990).

11. Angobaldo ran a metal part finishing business where his customer's machine-made or stamped parts would be "deburred" in machines run by Angobaldo and his employees in order to remove edges and debris and ready the parts for the customers' final assembly process.

12. Accord, In re Cooley, 87 B.R. 432, 443–45 (Bankr.S.D.Texas 1988) (finding § 541(a)(6)'s earnings exception unavailable as to 35.1% of the total income generated by debtor's medical practice, the same being generated by use of the estate's fixed assets and the services performed by associate surgeons). DeBoer also recognized that sole proprietorships might have service providers/income genera-

ly analogous to the *Angobaldo* situation, Dr. Atkinson here could have had employees who ran diagnostic or treatment equipment and either generated identifiable income therefrom or contributed in a tangible and calculable way toward total business income. However, unlike *Angobaldo*, the record simply does not support such a finding.

The Trustee also notes that *Angobaldo* determined the magnitude of excepted "earnings" by reference to the net income of the debtor's business. He urges the Court do the same here, and thus limit § 541(a)(6)'s application.

However, what the court in *Angobaldo* was actually doing was ensuring that the mathematical factor it found to exist on the evidence—that 85% of the income was attributable to the debtor's personal services and 15% was attributable to other sources—was properly applied:

> [T]he carve out for personal earnings mandated by *FitzSimmons* must be taken against the net earnings of the sole proprietorship. The effect of this conclusion is that no portion of a proprietor's earnings are taken away from him for the benefit of his creditors because the costs to operate the business are deducted before the individual debtor's earnings exception is calculated.

*Id.* at 150. The court thus took gross income, deducted business expenses, and then applied the 85% factor it had found on evidence to the net "earnings".[13] The other 15% was not within the personal services exception of § 541(a)(6).

In the absence of evidence of income generation sources other than Dr. Atkinson's own services, this aspect of *Angobaldo* does not require the Court to change its view of the Debtors' situation.

The next argument is that the $83,199.48 received by the Debtors over the course of the chapter 11 should represent a cap on the amount the Debtors may claim as their "earnings" under § 541(a)(6). The Trustee contends:

> [A]s stewards of the chapter 11 estate, the Debtors determined the appropriate amount of compensation to be paid for Dr. Atkinson's services, and that amount was $83,199.48. Consequently, any income derived by the business beyond the earnings the Debtors paid themselves is property of the estate under 11 U.S.C. § 541(a)(6) and (a)(7).

Chapter 7 Trustee's Supplemental Memorandum Regarding Post-petition, Preconversion Income As Property of the Chapter 7 Estate (Doc. No. 95) at 3–4. The Court disagrees, as this combines questions regarding the source of the funds with those regarding the use of the funds. In fact, this argument is akin to the idea that chapter 11 individual debtors should be provided a "salary," a contention which *FitzSimmons* "flatly rejected" in favor of actual ascertainment of the portion of earnings attributable to personal services and exclusion of that amount from the estate. *Angobaldo*, 160 B.R. at 150, citing 725 F.2d at 1210, 1212.

*Angobaldo* summarized, after a detailed review of the case law:

> [T]he Court concludes that the bankruptcy court opinions after *FitzSimmons* are not inconsistent with the Ninth Circuit's interpretation of the earnings exception. That is, the postpetition income stream of a sole proprietorship is to be allocated between that which is generated by the individual debtor's services, and that which is proceeds, profits, etc. from estate assets.

160 B.R. at 147. The Court concurs, and in applying this approach to the evidence

---

tors other than the owner. 99.3 I.B.C.R. at 104, and at 105, n. 10. Here, however, there are no other doctors employed in the business, or proof of income generators other than doctors.

**13.** ["Earnings" are] defined for common usage as "the balance of revenue for a specific period that remains *after deducting related cost and expenses incurred."* *Angobaldo*, 160 B.R. at 150, *quoting* Webster's Third New International Dictionary (Unabridged) (1986).

finds the Debtors' accounts to be within the earnings exception.[14]

## CONCLUSION

The Court concludes that the estate is entitled to $1,532.08, representing 25% of the prepetition accounts receivable which were collected during the case before conversion. The Trustee's motion for turnover will be granted as to this amount. The Debtors are entitled to retain the remainder of the prepetition accounts receivable actually collected as exempt property under § 11–207(1), and the objections to the Debtors' exemption in regard thereto will be denied.

Further, the Court concludes the Debtors are entitled to retain all post-petition accounts receivable held on the date of conversion by virtue of the earnings exception of § 541(a)(6). Trustee's motion for turnover will, in this regard, be denied. Since these accounts are not property of the estate, the question of exemption, and the objections to exemption, have been rendered moot.

Counsel for the Debtors shall prepare and submit a proposed form of order.

---

14. Though not addressed in detail, the Court has considered the other arguments and theories advanced by the Trustee and the U.S. Trustee, and finds them unavailing.